UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 07-2180(L)
(1:04-cv-00977-WO-PTS)

UNIVERSAL FURNITURE INTERNATIONAL, INCORPORATED,

Plaintiff - Appellee,

v.

COLLEZIONE EUROPA USA, INCORPORATED,

Defendant - Appellant.

O R D E R

The court amends its opinion filed August 20, 2010, as follows:

On the cover sheet, district court information section -- the name of "William L. Osteen, Sr., Senior District Judge" is added.

For the Court – By Direction

/s/ Patricia S. Connor
Clerk

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNIVERSAL FURNITURE
INTERNATIONAL, INCORPORATED,

*Plaintiff-Appellee,*

v.

COLLEZIONE EUROPA USA,
INCORPORATED,

*Defendant-Appellant.*

No. 07-2180

UNIVERSAL FURNITURE
INTERNATIONAL, INCORPORATED,

*Plaintiff-Appellee,*

v.

COLLEZIONE EUROPA USA,
INCORPORATED,

*Defendant-Appellant.*

No. 09-1437

Appeals from the United States District Court
for the Middle District of North Carolina, at Durham.
William L. Osteen, Jr., District Judge;
William L. Osteen, Sr., Senior District Judge.
(1:04-cv-00977-WO-PTS)

Argued: December 2, 2009

Decided: August 20, 2010

Before MICHAEL, MOTZ, and KING, Circuit Judges.

Affirmed by published per curiam opinion.

## COUNSEL

**ARGUED:** Nicholas Mesiti, HESLIN, ROTHENBERG, FARLEY & MESITI, PC, Albany, New York, for Appellant. William M. Bryner, KILPATRICK & STOCKTON, LLP, Winston-Salem, North Carolina, for Appellee. **ON BRIEF:** Brett M. Hutton, HESLIN, ROTHENBERG, FARLEY & MESITI, PC, Albany, New York, for Appellant. George L. Little, Jr., Laura C. Miller, KILPATRICK & STOCKTON, LLP, Winston-Salem, North Carolina; W. Swain Wood, WOOD JACKSON, PLLC, Raleigh, North Carolina, for Appellee.

## OPINION

PER CURIAM:

Appellant Collezione Europa USA, Incorporated ("Collezione"), and its adversary in this proceeding, appellee Universal Furniture International, Incorporated ("Universal"), are competing furniture companies. In 2004, Universal sued Collezione in the Middle District of North Carolina, alleging infringement under the Copyright Act with respect to two of Universal's furniture collections, as well as violations of the Lanham Act and the North Carolina Unfair and Deceptive Trade Practices Act (the "UDTPA"). In opposing the copyright claim, Collezione argued that the furniture at issue is not copyrightable. The district court disagreed, however, concluding that Universal possessed valid copyrights in its furniture designs and that Collezione had infringed those copyrights. *See Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc.*, No. 1:04-cv-00977 (M.D.N.C. Sept. 14, 2007) (the "Lia-

bility Opinion").[1] The court also concluded in its Liability Opinion that Collezione had misrepresented Universal's furniture lines as its own, in contravention of both the Lanham Act and the UDTPA. After conducting a thorough hearing on the damages issues, the court awarded more than $11 million to Universal. *See Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc.*, No. 1:04-cv-00977 (M.D.N.C. Feb. 12, 2009) (the "Damages Opinion").[2]

Collezione has appealed from the rulings made in the Liability Opinion, in favor of Universal, under the Copyright Act, the Lanham Act, and the UDTPA. Furthermore, Collezione contends that the court erred in the Damages Opinion in excluding its proof of deductible expenses. As explained below, we affirm.

## I.

## A.

Universal and Collezione have been embroiled in litigation since 2004 over Collezione's alleged copying of two of Universal's furniture collections. Collezione has a reputation as being a knock-off furniture company: that is, one that imitates the designs of its competitors for a lower cost. Indeed, Collezione's president acknowledged that his company routinely imitated other companies' furniture designs.

Universal is a North Carolina-based business that designs, imports, and distributes furniture that is manufactured outside this country. In 1994, Universal's predecessor, Universal Furniture Industries, Incorporated ("UFI"), entered into a design-service agreement with the Norman Hekler design firm (the

---

[1]The Liability Opinion is found at J.A. 2765-804. (Citations herein to "J.A. ___" refer to the contents of the Joint Appendix filed by the parties in this appeal.)

[2]The Damages Opinion is found at J.A. 3050-85.

"1994 service agreement"). Through a subsequent merger in 1998 (the "1998 merger"), UFI became Universal Furniture Limited ("UFL"). In 2001, Universal entered into an asset-purchase agreement with UFL (the "2001 asset agreement"). Among the assets purchased by Universal were all of UFL's intellectual property rights, including the 1994 service agreement.

Steven Russell was the Hekler designer who created the two Universal collections that are the subject of this dispute: the Grand Inheritance Collection (the "GIC") and the English Manor Collection (the "EMC"). Russell designed the GIC in 2001 and the EMC in 2002, and both collections were manufactured for Universal by a Chinese corporation called Lacquercraft. The GIC line became available to the public in April 2001 and the EMC line became available in April 2003.

Russell began his design process for the GIC and EMC lines by consulting public domain sources such as furniture books and antiques magazines. Russell then did "conceptual doodles" by hand until he came up with designs that were pleasing to his eye. J.A. 651-52. Russell asserted that he did not simply replicate research references in his designs. Rather, he used the references as inspiration and combined elements from the public domain to "create a different look than has been seen before." *Id.* at 805. Russell's objective was to blend looks from historical periods (rather than reproduce a particular period) and to "bring something new to the party on an historical theme." *Id.* at 673. Although he was influenced by functional concerns in designing the furniture, Russell was also motivated by aesthetic goals (such as making the furniture attractive to consumers).

In May and November 2003, Universal filed registration forms with the Copyright Office seeking copyright protection for the GIC and EMC lines. A supplementary registration form filed in July 2003 for the GIC line described the subject of the registration as the "decorative sculptural designs on fur-

niture; adaptation of preexisting decorative designs; compilation of decorative designs on suites of furniture." J.A. 1233. Similarly, the EMC registration form noted that, although the collection contained "public domain elemental designs," Universal sought copyright protection in the "[o]riginal decorative designs appearing on suites of furniture including original adaptations of public domain designs and original compilations of decorative designs." *Id.* at 1234B. The Copyright Office issued registrations to Universal for the GIC and EMC lines on the same day it received the applications.

In 2004, Rhodes Furniture — a major purchaser of the EMC and GIC lines — approached Collezione seeking a cheaper alternative to Universal's furniture. As a result, Collezione agreed to design furniture that would mimic the EMC and GIC lines. Collezione's Chief Financial Officer Paul Frankel admitted that Collezione intended to sell furniture similar to the GIC and EMC lines. Unaware that Universal had obtained its copyrights, Frankel nevertheless believed that the GIC and EMC designs were not entitled to copyright protection and that Collezione had the right to mimic them.

In 2004, Collezione introduced one collection (the "20000") to imitate the GIC line and another collection (the "20200") to imitate the EMC line. Collezione displayed the 20200 collection at the High Point, North Carolina furniture market in October 2004. Upon learning that Collezione was displaying furniture that was nearly identical to the EMC line, Universal's Senior Vice President Stephen Giles visited the High Point market. Giles was shocked by the similarity between Collezione's 20200 collection and the EMC line, and also concluded that Collezione was displaying furniture actually manufactured by Universal. Indeed, Giles believed that Collezione had simply removed Universal stickers from some pieces. In some instances, he noticed stickers (which he had designed) bearing the name of Universal's manufacturer, Lacquercraft. Giles took photographs of what he observed and

provided the evidence to Universal's Vice President Victor Hsu.

Claiming a violation of its copyrights, Universal promptly sent Collezione a cease and desist letter. Universal also filed suit against Collezione in October 2004 in the Middle District of North Carolina, alleging violations of the Copyright and Lanham Acts as well as state law violations of the UDTPA. Although Collezione believed that Universal's GIC and EMC lines were not entitled to copyright protection, it agreed to redesign its 20000 and 20200 collections to distinguish them from the GIC and EMC lines. Collezione also agreed to submit the redesigns to Universal before marketing them, but it later displayed the redesigns at a San Francisco furniture market and in the magazine *Furniture Today* without first submitting them to Universal. When the redesigns were finally submitted to Universal, they were still substantially similar to the GIC and EMC designs.

### B.

In May 2005, Universal sought a preliminary injunction in the district court barring Collezione's promotion and sale of its 20000 and 20200 collections. The court denied the motion, however, observing that the design compilations on Universal's furniture likely were not conceptually separable from the furniture's utilitarian function, rendering them unprotectable. We affirmed the district court's ruling on the preliminary injunction. *See Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc.*, 196 F. App'x 166 (4th Cir. 2006). In so doing, however, we emphasized the sparse record and stated that our intention was not to "categorically exclude Universal's and other comparable design compilations from copyright protection." *Id.* at 171.

In May 2007, Universal's lawsuit against Collezione proceeded to a five-day bench trial in Greensboro on the liability issues. The district court thereafter ruled, in its Liability Opin-

ion, that Universal owned its copyrights and that the GIC and EMC designs were copyrightable. More specifically, the court found that the designs — but not the furniture itself — satisfied two elements necessary for copyright protection: originality and conceptual separability. Although the decorative elements of Universal's designs were derived mostly from the public domain, the court concluded that the designer's compilation of the elements was sufficiently unique to meet the test of originality. The court also found the decorative elements conceptually separable from the furniture's utilitarian function, because the designer's functional considerations ended after he had sketched the basic shapes of the pieces and because the designer selectively placed elements on the furniture to achieve a "new look." *See* Liability Opinion 16.

After comparing Collezione's redesigned 20000 and 20200 collections to the GIC and EMC lines, the district court determined that nearly all of Collezione's furniture in these collections infringed Universal's copyrights because they were substantially similar to the GIC and EMC designs on extrinsic and intrinsic levels.[3] The court also assessed the extrinsic similarity by comparing the companies' furniture collections as a whole. It evaluated the issue of intrinsic similarity by making individual comparisons among the relevant furniture pieces. Finally, the court concluded that Collezione had violated the Lanham Act and the UDTPA by "reverse passing off" Universal's furniture as its own. *See* Liability Opinion 38. The court reserved the issue of damages for later determination.

---

[3]In particular, comparing the GIC line to Collezione's 20000 collection, the district court found infringement in the following items: Collezione's china cabinets, sideboards, headboards and footboards, dressers, chests of drawers, nightstands, armoires, and mirrors. It did not find similarity between the GIC line and the 20000 collection's chairs and rectangular tables. *See* Liability Opinion 22-28. The court found that Collezione's entire 20200 collection infringed Universal's copyright in the EMC designs. *Id.* at 28-29.

C.

In November 2007, the district court awarded Universal a permanent injunction prohibiting Collezione from producing or displaying derivative works of Universal's GIC and EMC lines. *See Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc.*, No. 1:04-cv-00977 (M.D.N.C. Nov. 30, 2007) (the "Injunction").[4] The Injunction also barred Collezione from marketing or selling any furniture in its 20000 collection (except for noninfringing chairs and rectangular tables) or its 20200 collection. On January 3, 2008, we denied Collezione's motion to stay the Injunction pending appeal.

After Collezione filed for bankruptcy in February 2008, Universal requested relief from the automatic stay to allow the district court to resolve the damages issues. The bankruptcy court agreed and lifted the stay, and a damages hearing was conducted in the district court in June 2008.

For Collezione's violation of the Copyright Act, the court awarded Universal more than $11 million, representing the gross revenues that Collezione had garnered from selling the infringing items. *See* Damages Opinion 29. Although copyright infringers are entitled to seek a reduction in damages by proving deductible expenses and profits unrelated to the infringement activities, the court rejected Collezione's proof in that regard. The court so ruled after giving Collezione repeated opportunities to present an accurate picture of its deductible expenses. The court declined, however, to award damages to Universal on either the Lanham Act or UDTPA claims, reasoning that any such damages would be duplicative of those awarded under the Copyright Act.

Collezione has filed a timely notice of appeal, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

---

[4]The Injunction is found at J.A. 2817-19.

## II.

We review a judgment resulting from a bench trial "under a mixed standard of review — factual findings may be reversed only if clearly erroneous, while conclusions of law . . . are examined de novo." *Roanoke Cement Co., LLC v. Falk Corp.*, 413 F.3d 431, 433 (4th Cir. 2005). A court's calculation of damages "is a finding of fact and therefore is reviewable only for clear error, but to the extent those calculations were influenced by legal error, review is de novo." *United States ex rel. Maddux Supply Co. v. St. Paul Fire & Marine Ins. Co.*, 86 F.3d 332, 334 (4th Cir. 1996).

## III.

In disposing of this appeal, we assess the issues in the same order as did the district court. We begin by examining whether Universal owned valid copyrights in the GIC and EMC furniture designs and, if so, whether Collezione infringed those copyrights. We then assess whether Collezione contravened the Lanham Act and the UDTPA by displaying Universal's furniture as its own at the High Point furniture market in 2004. Finally, we review Collezione's contention that the court erroneously excluded its evidence of deductible expenses in making the damages award.

## A.

Collezione first challenges the district court's conclusion that Universal possessed valid copyrights in the GIC and EMC furniture designs and that Collezione infringed those copyrights. In this regard, Collezione presents four appellate contentions. First, Collezione maintains that the court erred in ruling that Universal owned the copyrights. Second, Collezione insists that Universal's designs on the GIC and EMC lines are not sufficiently original for copyright protection. Third, Collezione contends that the GIC and EMC designs are not conceptually separable from the furniture's utilitarian

aspects, and thus not entitled to copyright protection. And fourth, Collezione maintains that, even if the GIC and EMC designs are copyrightable, it did nothing that infringed those copyrights. We address these contentions in turn.

1.

We begin with the issue of whether Universal owned the copyrights. The Copyright Act affords protection to "original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated." 17 U.S.C. 102(a). A plaintiff claiming copyright infringement must establish "ownership of the copyright by the plaintiff and copying by the defendant." *Keeler Brass Co. v. Cont'l Brass Co.*, 862 F.2d 1063, 1065 (4th Cir. 1988). A certificate of registration issued by the Copyright Office is "prima facie evidence of the validity of the copyright and of the facts stated in the certificate," such as ownership. 17 U.S.C. § 410(c). When such a certificate exists, the burden shifts to the defendant to prove that the claimed copyrights are invalid. *M. Kramer Mfg. Co. v. Andrews*, 783 F.2d 421, 434 (4th Cir. 1986). However, the Copyright Office's practice of summarily issuing registrations (perhaps even the day of filing the application, as in this case) counsels against placing too much weight on registrations as proof of a valid copyright. *Universal Furniture*, 196 Fed. Appx. at 170. Accordingly, a reviewing court should assess other relevant indicia of ownership, such as the parties' intent and the terms of transfer agreements and other documents establishing a chain of title. *See, e.g.*, *SCO Group, Inc. v. Novell, Inc.*, 578 F.3d 1201, 1209 (10th Cir. 2009); *Accusoft Corp. v. Palo*, 237 F.3d 31, 58 (1st Cir. 2001).

Collezione maintains that Universal failed to establish a chain of title linking Universal to the 1994 service agreement between the Norman Hekler design firm and Universal's predecessor company, UFI. More specifically, Collezione con-

tends that Universal did not prove ownership of the copyrights to the EMC and GIC designs that Steven Russell of the Hekler firm designed after the 1994 service agreement was made.

The registrations issued by the Copyright Office for the GIC and EMC lines identify Universal as the claimant. These registrations were presumptive proof of Universal's ownership of the asserted copyrights, and the other evidence also suggests that result. The 2001 asset agreement between UFL and Universal conveys "all right, title, and interest . . . to the Intellectual Property including, but not limited to, the Intellectual Property listed on Schedule 2.1(e)." J.A. 3098. Schedule 2.1(e), in turn, lists the 1994 service agreement between Hekler and UFI. The 1994 service agreement is also specified as among the "contracts" explicitly transferred to Universal. *See id.* at 3098, 3155. Although Russell designed the EMC in 2002, after the 2001 asset agreement, such agreement clearly transferred the intellectual property rights specified in the 1994 service agreement. The terms of the 1994 service agreement are not time-limited, and the 2001 asset agreement could therefore include future designs made by Hekler employees. Indeed, the 1994 service agreement provides that Hekler "shall apply its skill, knowledge, and expertise to the design of each item of furniture as [UFI] may, from time to time, request in writing." *Id.* at 1266.

In making its chain-of-title argument, Collezione misunderstands that it bears the burden of rebutting the presumption of ownership established by the copyright registrations. *M. Kramer Mfg.*, 783 F.2d at 434. Universal's documentation of the 1998 merger and the 2001 asset agreement links Universal to the Hekler contract and to Russell's design of the GIC and EMC under the 1994 service agreement. Collezione argues that Universal failed to prove that the 1994 service agreement was included in the 1998 merger between UFI and UFL. Nevertheless, the 2001 asset agreement between UFL and Universal explicitly includes the 1994 service agreement with

Hekler, which indicates that UFI remained a party to the 1994 service agreement and thus had the right to transfer that agreement to UFL in the 1998 merger. Although Universal did not present evidence of the specific assets that UFL acquired in the 1998 merger, this was not Universal's burden. Finally, although the Copyright Act generally requires a writing to transfer copyright ownership, it makes exceptions for transfers that occur "by operation of law." 17 U.S.C. § 204(a). And certain of our sister circuits have ruled that mergers transfer copyrights "by operation of law" and obviate the writing requirement. *See Taylor Corp. v. Four Seasons Greetings, LLC*, 403 F.3d 958, 963 (8th Cir. 2005); *Lone Ranger Television, Inc. v. Program Radio Corp.*, 740 F.2d 718, 721 (9th Cir. 1984). As a result, the district court did not err in concluding that Universal established its ownership of the asserted copyrights.[5]

2.

Next, we assess whether Universal's designs on the GIC and EMC lines are sufficiently original for copyright protection. To claim a valid copyright, Universal was obliged to show that the GIC and EMC designs are (1) original and (2) conceptually separable from the utilitarian aspects of the furniture. *Superior Form Builders v. Dan Chase Taxidermy Supply Co.*, 74 F.3d 488, 492-93 (4th Cir. 1996). Each of these elements requires fleshing out the term "designs" because the "industrial design" of even "aesthetically pleasing" furniture

---

[5]Collezione correctly points out, however, that the district court inaccurately described the chain of title. The court mistakenly specified the year of the 2001 asset agreement as 1997, not 2001. The court also mistakenly believed that the 2001 asset agreement was between UFI and UFL rather than between UFL and Universal. And, given that Steven Russell designed the GIC in 2001 and the EMC in 2002, the court erred when it noted that Universal contracted with Russell to design these collections in 2003. Notwithstanding the court's misdescriptions, Universal's evidence sufficiently establishes its ownership of the asserted copyrights in the GIC and EMC designs.

is not entitled to copyright protection. *Id.* at 493. Recognizing this distinction, the district court properly looked to the copyright registrations that Universal filed, which describe the subjects of the sought-after protection as the "decorative sculptural designs on furniture, the adaptation of preexisting decorative designs, and the compilation of decorative designs on suites of furniture." *See* Liability Opinion 3.

Establishing originality implicates only a light burden. "Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345 (1991). "[T]he requisite level of creativity is extremely low; even a slight amount will suffice. The vast majority of works make the grade quite easily, as they possess some creative spark." *Id.*

Even when the work at issue is a compilation of preexisting design elements, the originality threshold remains low: "Copyright protection may extend to such a compilation, even if the material of which it is composed is not copyrightable itself . . . ; it is sufficient if original skill and labor is expended in creating the work." *M. Kramer Mfg.*, 783 F.2d at 438 (internal citations and quotation marks omitted). "The mere fact that component parts of a collective work are neither original to the plaintiff nor copyrightable by the plaintiff does not preclude a determination that the combination of such component parts as a separate entity is both original and copyrightable." *Id.* (internal citation and quotation marks omitted). For compilations of preexisting elements, "the principal focus should be on whether the selection, coordination, and arrangement are sufficiently original to merit protection." *Feist*, 499 U.S. at 358.

The submission of a valid certificate of copyright registration creates a presumption of originality for five years from the date of the registration. *Swirsky v. Carey*, 376 F.3d 841,

851 (9th Cir. 2004). However, as we have explained, this presumption is fairly easy to rebut because the Copyright Office tends toward cursory issuance of registrations. *Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc.*, 196 Fed. Appx. 166, 170 (4th Cir. 2006). "[T]he presumption of validity may be rebutted where other evidence in the record casts doubt on the question," such as "evidence that the work had been copied from the public domain or by evidence that the work was a non-copyrightable utilitarian article." *Fonar Corp. v. Domenick*, 105 F.3d 99, 104 (2d Cir. 1997) (internal citation and quotation marks omitted).

The supporting evidence in this record demonstrates that the GIC and EMC designs are original. Russell's design process satisfied the low burden for originality in that it demonstrated "some creative spark" and did not involve wholesale copying. *Feist*, 499 U.S. at 345. Under the evidence, Russell expended "original skill and labor" in selecting and adapting the decorative elements, and he created an original "separate entity" by blending elements from different historical periods. *M. Kramer Mfg.*, 783 F.2d at 438. His consultation of public domain sources does not render the EMC and GIC designs non-original for copyright purposes. He did not set out to create an "authentic period reproduction" in designing the EMC and GIC furniture. J.A. 646. Although the ornamental elements placed on the GIC and EMC furniture were culled from a variety of public domain sources, Russell did more than simply copy those sources. He consulted various reference books and magazines and then sketched until he arrived at a design that he deemed to be aesthetically pleasing. Russell explained that he modified — rather than replicated — these sources. His objective was to "bring something new to the party on a historical theme." *Id.* at 673. He described his skill as "offer[ing] modernized interpretations of historical pieces of furniture," which he accomplished by blending elements to "create a different look than has been seen before." *Id.* at 805. Universal's expert witness, furniture designer Thomas Moser, testified that "the act of collecting and sorting

through, synthesizing from other sizes, in some cases making an artistic leap by joining two vastly different periods together . . . requires a good deal of training and experience and artistry." *Id.* at 927. Although Moser agreed that the GIC and EMC ornamental designs originated in the public domain, he opined that the selection, coordination, and arrangement of these elements reflected Russell's creative judgment. Moser explained that these elements are not simply compiled; they "pass through . . . the filter of the creator," who "takes them and adapts them to serve his purposes." *Id.* at 967.

In arguing against originality, Collezione relies on a single Second Circuit decision involving a design process that is readily distinguishable from Universal's. In *L. Batlin & Son, Inc. v. Snyder*, 536 F.2d 486, 488 (2d Cir. 1976), the appellant took the famous metal Uncle Sam mechanical bank design and recreated it in plastic. The court of appeals held that the plastic recreation was not sufficiently original for copyright purposes because it was a "mere copy" of the metal version, and the "mere reproduction of a work of art in a different medium should not constitute the required originality." *Id.* at 491 (quoting 1 M. Nimmer, *The Law of Copyright*, § 20.2, at 93 (1975)). The court, however, did not further address the issue of originality in connection with compilations. In this situation, Russell did more than simply take two-dimensional decorative designs from the public domain and copy them wholesale on three-dimensional furniture. He modified and arranged the decorative elements in unique ways, which is more than sufficient to satisfy the low threshold for originality.

3.

We turn now to a more vexing question in this case: whether Universal's GIC and EMC designs are conceptually separable from the utilitarian aspects of such furniture. We must approach this inquiry mindful of the nebulous standard with which the court was obliged to grapple. *See Masquerade*

*Novelty, Inc. v. Unique Indus., Inc.*, 912 F.2d 663, 670 (3d Cir. 1990) ("Courts have twisted themselves in knots trying to create a test to effectively ascertain whether the artistic aspects of a useful article can be identified separately from and exist independently of the article's utilitarian function."); *Bonazoli v. R.S.V.P. Int'l, Inc.*, 353 F. Supp. 2d 218, 224 (D.R.I. 2005) ("[T]he [conceptual separability] analysis often sounds more like metaphysics than law . . . ."); *1-2 Nimmer on Copyright*, § 2.08 (describing conceptual separability as an "ethereal realm"). When we affirmed the denial of the preliminary injunction sought by Universal, we expressed concern that finding the GIC and EMC designs copyrightable would "potentially enlarge the law of copyright beyond its intended borders by extending copyright protection to two entire furniture collections based on their 'ornate, opulent' look alone." *Universal Furniture*, 196 Fed. Appx. at 172. With the benefit of a full record, however, we are confident that the district court correctly applied the conceptual separability test and did not expand the law to protect any useful article that might be deemed "aesthetically pleasing." *Superior Form*, 74 F.3d at 493.

Copyright protection extends to three-dimensional "sculptural works," including some useful articles. 17 U.S.C. § 102(a)(5).[6] "[T]he design of a useful article . . . shall be considered . . . a sculptural work only if, and only to the extent that, such design incorporates pictorial, graphic, or sculptural features that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article." *Id.* § 101. Under this conceptual separability test, useful articles may qualify for copyright protection. *Galiano v. Harrah's Operating Co.*, 416 F.3d 411, 417 (5th Cir. 2005).

---

[6]A "useful article" is "an article having an intrinsic utilitarian function that is not merely to portray the appearance of the article or to convey information." 17 U.S.C. § 101. Universal's furniture satisfies this definition. *See Universal Furniture*, 196 Fed. Appx. at 170.

Congress enacted the current phrasing of the conceptual separability test in order to codify the Supreme Court's holding in *Mazer v. Stein*, 347 U.S. 201 (1954). H.R. Rep. No. 94-1476, at 55 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5667. In *Mazer*, the Court held that china statuettes of dancing figures that appeared on the bases of table lamps merited copyright protection. 347 U.S. at 214. Although the term "conceptual separability" does not appear in the *Mazer* decision, the idea is embedded in the Court's recognition that the statuettes were the "original . . . tangible expression of [the creator's] ideas," even though they appeared on an otherwise mundane utilitarian object. *Id.*

In a decision rendered soon after the amended language appeared in the 1976 Copyright Act, the Court of Appeals for the District of Columbia explained the underlying policy concern with which reviewing courts struggle: "If one manufacturer were given the copyright to the design of . . . [a useful] article, it could completely prevent others from producing the same article." *Esquire, Inc. v. Ringer*, 591 F.2d 796, 801 n.15 (D.C. Cir. 1978). Further, "consumer preference sometimes demands uniformity of shape for certain utilitarian articles" and thus "it would be unfair to grant a monopoly on the use of any particular such shape, no matter how aesthetically well it was integrated into a utilitarian article." *Id.* Professor Nimmer, however, posits that "it is not entirely clear that the result is undesirable" because "[i]f copyright is to be accorded *only to the nonfunctional* form of a work, this would not inhibit competitors from making available to the public the utilitarian essence of an industrial product." *1-2 Nimmer on Copyright* § 2.08 (emphasis added).

Because the evolving iterations of the conceptual separability test are cogently charted in several cases, we need not retread the path here. *See, e.g.*, *Galiano*, 416 F.3d at 417-19; *Pivot Point Int'l, Inc. v. Charlene Prods.*, 372 F.3d 913, 920-30 (7th Cir. 2004). After an extensive analysis of the varying approaches, the Seventh Circuit concluded that courts had

moved toward a "process-oriented" approach, distilling the conceptual separability test as follows:

> Conceptual separability exists . . . when the artistic aspects of an article can be conceptualized as existing independently of their utilitarian function. This independence is necessarily informed by whether the design elements can be identified as reflecting the designer's artistic judgment exercised independently of functional influences. If the elements do reflect the independent, artistic judgment of the designer, conceptual separability exists. Conversely, when the design of a useful article is as much the result of utilitarian pressures as aesthetic choices, the useful and aesthetic elements are not conceptually separable.

*Pivot Point*, 372 F.3d at 931 (internal quotations and citations omitted).

Our circuit has not elaborated extensively upon conceptual separability. In *Superior Form Builders*, we considered whether animal mannequins used to mount animal skins were copyrightable. 74 F.3d at 491. We held that the mannequins were not "useful articles" under the Copyright Act and therefore did not need to meet the test of conceptual separability. *Id.* at 494. However, because we went on to address conceptual separability "[t]o the extent that an argument can be made that the mannequins . . . perform a utilitarian function," the decision provides some guidance here. *Id.* We observed, for example, that "the *industrial design* of a unique, aesthetically pleasing chair cannot be separated from the chair's utilitarian function, and therefore, is not subject to copyright protection." *Id.* at 493 (emphasis added). The industrial design of a chair is unlike the design of statuettes adorning lamp bases because the objective of the chair's design is to "create a utilitarian object, albeit an aesthetically pleasing one," whereas "the objective in creating a statue of a dancer is to express the idea of a dancer." *Id.*

*Superior Form*'s example of the industrial design of a chair fails to directly address the category of designs at issue here: compilations of decorative elements adorning utilitarian furniture. In other words, Universal does not seek copyright protection for the purely "industrial" designs of its furniture, and the district court correctly recognized as much by explaining that the "*shape* of the furniture cannot be the subject of a copyright, no matter how aesthetically pleasing it may be," but the "*decorative elements* that are separable from the furniture can be." Liability Opinion 17 (emphases added). Conceptual separability directs a reviewing court to answer whether protection extends to the "nonfunctional form of a work." *1-2 Nimmer on Copyright* § 2.08.

In *Carol Barnhart Inc. v. Economy Cover Corp.*, 773 F.2d 411, 414 (2d Cir. 1985), the Second Circuit held that life-sized mannequins of human torsos used to display clothing had no "artistic or aesthetic features" that were "physically or conceptually separable from their utilitarian dimension." The court thus rejected the designer's argument that the mannequins were akin to sculptures and could serve a decorative function apart from the utilitarian purpose of serving as a vehicle for clothing and accessories. *Id.* at 418. That the mannequins may have been "aesthetically satisfying" was not enough for copyright protection. *Id.* The Second Circuit distinguished that case from an earlier decision finding copyright protection in "belt buckles bearing sculptured designs cast in precious metals and principally used for decoration." *Id.* (citing *Kieselstein-Cord v. Accessories by Pearl, Inc.*, 632 F.2d 989 (2d Cir. 1980)). The "highly ornamental" designs on the belt buckles were totally unlike the bare model of a human torso; the "unique artistic design" of the buckles "was wholly unnecessary to performance of the utilitarian function" of the belts. *Id.* at 419. In contrast, the sculpted anatomical elements on the torso mannequins, while perhaps aesthetically pleasing, were "inextricably intertwined with the utilitarian feature, the display of clothes." *Id.*

Synthesizing these principles, we are compelled to reach the same conclusion as the district court: the decorative elements on Universal's GIC and EMC are conceptually separable from the furniture's utilitarian aspects. The GIC and EMC designs are highly ornate collections of furniture adorned with three-dimensional shells, acanthus leaves, columns, finials, rosettes, and other carvings. Steven Russell described the collections as "an ornamentation explosion," and Universal's expert Thomas Moser similarly described the EMC and GIC as "essentially vehicles for expressing ornament." J.A. 645, 926. These decorative compilations are not "industrial designs" of furniture. They are not like a bare human torso mannequin for which adornment is the very utilitarian purpose of the object. Like statuettes on a lamp base, the GIC and EMC design compilations are superfluous nonfunctional adornments for which the shape of the furniture (which is not copyrightable) serves as the vehicle. The designs can therefore be "identified separately from" the utilitarian aspects of the furniture. 17 U.S.C. § 101. Indeed, the designs are "wholly unnecessary" to the furniture's utilitarian function. *Carol Barnhart*, 773 F.2d at 419. A carved scroll of leaves on a nightstand post, for example, does nothing to improve the utilitarian aspect thereof.

As in *Pivot Point*, Mr. Russell's process reflects an "artistic judgment exercised independently of functional influences." 372 F.3d at 931. To be sure, Russell was influenced by function in designing these decorative elements. After all, he explained, furniture "has got to function." J.A. 817. But his objective in compiling these decorative elements onto the basic shapes of the furniture was not to improve the furniture's utility but to "give [the pieces] a pretty face." *Id.* at 816. He developed the shape of the furniture before turning to ornamentation. For many of the decorative elements on the furniture, such as carved shells and leaves, Russell's purpose was entirely aesthetic. Moser similarly testified to the "exuberant" ornamentation on the GIC and EMC furniture and opined that "the ornamentation . . . has little or nothing to do

with the function of these lines." *Id.* at 853-54. In sum, Russell's design and placement of these decorative elements was not "as much the result of utilitarian pressures as aesthetic choices." *Pivot Point*, 372 F.3d at 931. Aesthetic choices were the dominant force at work in Russell's design process.

However, the conceptual separability test is a conjunctive one: the decorative elements adorning the GIC and EMC lines must be capable of separate identification from the utilitarian aspects of the furniture, and they must be capable of "existing independently of, the utilitarian aspects of the [furniture.]" 17 U.S.C. § 101. This poses somewhat of a metaphysical quandary for decorative elements on furniture. The elements serve no purpose divorced from the furniture — they become designs in space. But the test is conceptual separability, not physical separability. *1-2 Nimmer on Copyright*, § 2.08. The House Committee that drafted the 1976 Copyright Act contemplated that the conceptual separability test could be satisfied in this very context:

> [O]nly elements . . . which can be identified separately from the useful article as such are copyrightable. And, even if the three-dimensional design contains some such element (for example, a *carving on the back of a chair or a floral relief design on silver flatware*), copyright protection would extend only to that element, and would not cover the overall configuration of the utilitarian article as such.

H.R. Rep. No. 94-1476, at 55 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5668 (emphasis added). Like sculpted designs on belt buckles, the decorative elements adorning the GIC and EMC lines are "conceptually separable sculptural elements." *Kieselstein-Cord*, 632 F.2d at 993. Their form is not "inextricably intertwined" with the function of furniture. *Carol Barnhart*, 773 F.2d at 419. They are "artistic and aesthetic features" that can "be conceived of as having been added to, or superimposed upon, an otherwise utilitarian arti-

cle," and they are therefore capable of existing independently of the furniture. *Id.*

Because the GIC and EMC designs are original and conceptually separable from the utilitarian aspects of the furniture, we agree with the district court that the compilation of design elements on the EMC and GIC lines are entitled to copyright protection.[7]

4.

We next assess whether Collezione infringed Universal's copyrights. Assuming that the district court correctly applied the legal standard, its factual findings regarding the similarity between Universal's GIC and EMC lines and Collezione's 20200 and 20000 collections are entitled to considerable deference. *Roanoke Cement*, 413 F.3d at 433; *see also Taylor Corp.*, 403 F.3d at 965 (observing that most circuits apply a clearly erroneous standard of review to factual finding of substantial similarity even though credibility is not implicated). Collezione argues that the court incorrectly applied the legal standard for copyright infringement by comparing Universal and Collezione's furniture as a whole, rather than comparing the compilations of design elements.

A successful claim of copyright infringement requires the plaintiff to prove that the "defendant copied the original elements of that copyright." *Lyons P'ship v. Morris Costumes,*

---

[7]Collezione incorrectly asserts that the district court found Universal's "furniture, as a whole, to be copyrightable, rather than the compilations of public domain designs on the furniture." Br. of Appellant 42. The court was explicit that "[w]hile the shape of the furniture cannot be the subject of a copyright, no matter how aesthetically pleasing it may be, the *decorative elements* that are separable from the furniture can be." Liability Opinion 17 (emphasis added). The court likewise concluded that Collezione "violated the Copyright Act by producing pieces of furniture displaying substantially similar *types and arrangements of decorative elements* as used in [Universal's] furniture." *Id.* at 39 (emphasis added).

*Inc.*, 243 F.3d 789, 801 (4th Cir. 2001). "When the plaintiff possesses no direct evidence that the defendant copied its protected work, it may create a presumption of copying by indirect evidence establishing that the defendant had access to the copyrighted work and that the defendant's work is 'substantially similar' to the protected material." *Id.* (internal citation omitted). Substantial similarity is a two-pronged test. The plaintiff must show that the two works are (1) "extrinsically similar because they contain substantially similar ideas that are subject to copyright protection" and (2) "intrinsically similar in the sense that they express those ideas in a substantially similar manner from the perspective of the intended audience of the work." *Id.* (internal citations and quotation marks omitted).

The extrinsic inquiry is an objective one on which expert testimony may be relevant. *Dawson v. Hinshaw Music, Inc.*, 905 F.2d 731, 733 (4th Cir. 1990). The extrinsic analysis looks to "external criteria" of "substantial similarities in both ideas and expression." *Apple Computer Co. v. Microsoft Corp.*, 35 F.3d 1435, 1442 (9th Cir. 1994). The intrinsic inquiry, in contrast, implicates the perspective of the object's intended observer. *Dawson*, 905 F.3d at 733. In assessing intrinsic similarity, the factfinder looks to the "total concept and feel of the works, but *only* as seen through the eyes of the . . . intended audience of the plaintiff's work." *Lyons*, 243 F.3d at 801. (internal citations and quotation marks omitted) (emphasis in original). Judge Learned Hand phrased the intrinsic test as whether "the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard their aesthetic appeal as the same." *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir. 1960).

Collezione maintains that the district court incorrectly applied the substantial similarity test by comparing the non-copyrightable elements of the parties' furniture collections. On the extrinsic prong, Collezione argues that the court's

comparison of the two furniture collections as a whole improperly factored in noncopyrightable features such as the furniture's shape and color. On the intrinsic prong, Collezione argues that the court's comparison of individual pieces of furniture within each collection also encompassed these noncopyrightable features.

In the furniture context, the external criteria of similar ideas and expressions will presumably be the collections' historical themes and ornamentation. *Cf. Taylor*, 403 F.3d at 966 (concluding that district court correctly applied extrinsic test to holiday greeting card designs by considering the cards' "similar holiday themes, paper stock and printing techniques"). "Idea" and "expression" are broad concepts, and the district court properly compared the ideas and expressions of Universal and Collezione's collections by considering the furniture as a whole.

Still, substantial similarity asks whether a defendant copied the "*original* elements" of a copyright. *Lyons*, 243 F.3d at 801 (emphasis added). The district court's extrinsic analysis briefly mentioned the furniture's noncopyrightable features such as similarity of shape and color. And the court would have erred had it found similarity *only* in the collection's noncopyrightable features. *See Herzog v. Castle Rock Entm't*, 193 F.3d 1241, 1257 (11th Cir. 1999) ("A court may grant summary judgment for defendant as a matter of law if the similarity between the two works concerns only noncopyrightable elements of the plaintiff's work."). But the court's extrinsic analysis largely focused on the copyrightable aspects of Universal's GIC and EMC: the ornamentation. The court determined that the collections shared a "highly decorative appearance with a traditional feel" and "very ornamental designs combined with basic styles that resemble furniture pieces from England in the 18th or 19th centuries." Liability Opinion 21-22. In so finding, the court relied on Universal's expert testimony, which is helpful to the extrinsic prong. *Dawson*, 905 F.2d at 733. In Thomas Moser's view, Univer-

sal's and Collezione's collections shared a "great collection of ornamental detail, principally in the form of relief carvings" and were "similar in terms of placement, selection, arrangement, and most certainly execution." J.A. 860. Moser explained that Universal's GIC had a "consistency in the application of the ornament, neither too much or too little," and that Collezione's 20000 collection shared this aesthetic "harmony." *Id.* at 893. He described the ornamentation on these collections as taking up the same amount of space on the furniture. In sum, the district court correctly applied the extrinsic prong by considering whether the protected aspects of Universal's GIC and EMC lines were substantially similar in idea and expression to Collezione's 20000 and 20200 collections. We thus find no clear error in the court's determination of extrinsic similarity.

Collezione's argument with respect to the intrinsic prong of substantial similarity is also unavailing because, as other circuits have observed, "analytic dissection" of protected and unprotected elements is inappropriate under the intrinsic prong, given that the ordinary observer does not make this distinction. *Taylor*, 403 F.3d at 966; *Knitwaves, Inc. v. Lollytogs, Ltd.*, 71 F.3d 996, 1003 (2d Cir. 1995). Rather, the ordinary observer encounters the furniture as one object.

The district court properly assessed whether the ordinary observer of individual pieces of furniture within the disputed collections would "see each piece the same, discounting any trivial differences." Liability Opinion 22; *see Taylor*, 403 F.3d at 966 ("[A] finding of substantial similarity is not precluded where differences in detail do little to lessen a viewer's overwhelming impression that the defendant's products are appropriations." (internal citation and quotation marks omitted)). The court made detailed comparisons of the ornamental designs on the individual pieces within the competing collections. Collezione resorts to selective references to the Liability Opinion to suggest that the intrinsic similarity analysis focused on noncopyrightable elements. Br. of Appellant 45.

Although the court again mentioned noncopyrightable features such as the furniture's shape and color, it appropriately focused on whether the ordinary, reasonable observer would find the furniture lines, as a whole, to be substantially similar. *Taylor*, 403 F.3d at 966. Additionally, the court's analysis clearly concentrated on the compilation of designs on the furniture. For example, it found that Collezione's 20000 sideboards were "nearly identical" to Universal's GIC sideboards because both had "decorative elements in the same places with carvings such as the rosette atop the pilasters and molding around the top railings," as well as "matching inlays in the side doors bordered by matching carved moldings." Liability Opinion 24. The court made similar detailed comparisons of the ornamentation on the other pieces in Collezione's 20000 collection. Although the court's comparison of Collezione's 20200 collection to Universal's EMC was less detailed, the court did not clearly err by finding that the entire 20200 collection was substantially similar to the EMC. The court determined that Collezione "undertook significantly less effort with respect to redesigning the 20200 collection than it did with its 20000 collection" and that Collezione essentially copied the EMC. *Id.* at 28-29. The photographs in evidence show near exact similarity between these collections, as well as between most of Universal's GIC and Collezione's 20000 collections. Accordingly, the court did not err in determining that most of Collezione's 20000 redesigns infringed Universal's GIC copyright[8] and that all of Collezione's 20200 redesigns infringed Universal's EMC copyright.

## B.

Collezione next challenges the district court's determination that it violated the Lanham Act by marketing actual

---

[8]We agree with the district court that Collezione's 20000 chairs and rectangular tables are not intrinsically similar to Universal's GIC chairs and rectangular tables. These pieces therefore do not infringe Universal's copyrights.

pieces from Universal's EMC line as its own furniture at the High Point furniture market in October 2004. The Lanham Act prohibits a "false designation of origin" that is "likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association . . . or as to the origin" of "goods, services, or commercial activities." 15 U.S.C. § 1125(a)(1)(A). The type of false designation of origin at issue here is a "reverse passing off," which occurs when a "producer misrepresents someone else's goods or services as his own." *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 28 n.1 (2003). A reverse passing off claim requires the plaintiff to prove four elements: "(1) that the work at issue originated with the plaintiff; (2) that origin of the work was falsely designated by the defendant; (3) that the false designation of origin was likely to cause consumer confusion; and (4) that the plaintiff was harmed by the defendant's false designation of origin." *Syngenta Seeds, Inc. v. Delta Cotton Coop, Inc.*, 457 F.3d 1269, 1277 (Fed. Cir. 2006).

On the first element, Universal is the "origin" of the EMC even though it does not manufacture the furniture. Although "the most natural understanding of the 'origin' of 'goods' — the source of wares — is the producer of the tangible product," origin may also encompass "the trademark owner who commissioned or assumed responsibility for ('stood behind') production of the physical product." *Dastar*, 539 U.S. at 31-32. Universal is the company that markets and "stands behind" its furniture collections. Universal labels the furniture with its name, distributes the furniture, and owns the copyrights in the designs.

With respect to the second element — that the origin of the work was falsely designated — the district court found this element satisfied by Collezione's display of actual pieces from Universal's EMC line at the 2004 High Point furniture market. The court's credibility determinations and factual findings in that respect are entitled to our deference, and we

are unable to identify clear error. The court examined and assessed photographs of the showroom furniture and heard testimony from Universal Vice-President Stephen Giles, who took the photographs after learning that Collezione was selling furniture strikingly similar to the EMC line. Giles confirmed that Collezione's display samples bore lot control stickers that he had designed for Universal. The court compared photographs of Universal's EMC pieces to the photographs taken by Giles and concluded that Collezione was marketing Universal's furniture at the showroom. The photographs in evidence amply support the court's finding. *Compare* J.A. 2531, *id.* at 2539-40, *and id.* at 2497, *with id.* at 1272, *id.* at 1274, and *id.* at 1278. Because Collezione displayed actual pieces from Universal's EMC line and marketed them as belonging to its 20200 collection, Collezione falsely designated the origin of such furniture.

The third element of the reverse passing off claim, consumer confusion, requires a showing that a "substantial number . . . of consumers are likely to be misled." *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 280 (4th Cir. 2002). "While there is no bright line test to determine the existence of a likelihood of consumer confusion, recovery under the Lanham Act requires, at a minimum, that confusion, mistake, or deception be likely, not merely possible." *Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc.*, 508 F.3d 641, 651 (11th Cir. 2007) (internal citation and quotation marks omitted). As the Sixth Circuit has observed, when a "defendant has taken the plaintiff's product and has represented it to be his own work," it is "difficult to imagine how a designation of origin of a product could be more false, or could be more likely to cause confusion or mistake as to the actual origin of the product." *Johnson v. Jones*, 149 F.3d 494, 503 (6th Cir. 1998). Collezione's display of Universal's furniture at a lower price was likely to mislead a substantial number of consumers. As the district court recognized, "[i]t would be difficult to fathom a situation where a customer would not be confused by seeing two different companies marketing the same furniture under

different names." Liability Opinion 37. Indeed, consumer confusion is what prompted Giles to visit the showroom for inspection; he learned of Collezione's display from a confused dealer.

Finally, turning to the fourth element, we must reject Collezione's contention that, because it did not actually sell the EMC furniture and recalled its sales photos of the furniture, Universal suffered no harm from the false designation. Even if the EMC furniture never left the High Point showroom, the district court properly found that Universal suffered harm simply from the display of its furniture by Collezione. A significant harm of reverse passing off is that the "originator of the misidentified product is involuntarily deprived of the advertising value of its name and of the goodwill that otherwise would stem from public knowledge of the true source of the satisfactory product." *Smith v. Montoro*, 648 F.2d 602, 607 (9th Cir. 1981). As the Supreme Court explained in *Dastar*, the Lanham Act "assure[s] a producer that it (and not an imitating competitor) will reap the financial, reputation-related rewards associated with a desirable product." 539 U.S. at 34 (internal citation and quotation marks omitted). We thus agree with the district court that Collezione's display of the EMC furniture deprived Universal of "the opportunity to earn sales and profits." Liability Opinion 37. By displaying Universal's furniture as its own for a lower price, Collezione appears to have retained customers that would have otherwise purchased from Universal, even if it did not actually sell the EMC pieces in question. Universal introduced evidence that Collezione sold pieces in its 20200 collection to customers who placed their orders during the period in which Collezione displayed corresponding pieces of Universal's EMC line. We therefore affirm the court's ruling that Collezione violated the Lanham Act.

## C.

Collezione also challenges the district court's determination that it violated North Carolina's UDTPA by displaying Uni-

versal's furniture during the 2004 High Point furniture market. The UDTPA makes unlawful "unfair methods of competition in or affecting commerce" and "unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. § 75-1.1. As used in the UDTPA, the words "unfair methods of competition" encompass "any conduct that a court of equity would consider unfair." *Polo Fashions, Inc. v. Craftex, Inc.*, 816 F.2d 145, 148 (4th Cir. 1987). More specifically, a "practice is unfair if it is unethical or unscrupulous, and it is deceptive if it has a tendency to deceive." *Id.*

In these circumstances, we are unable to conclude that Collezione's conduct — displaying a rival company's products as though they were its own — was neither unfair nor deceptive. The district court found that Collezione not only displayed Universal's EMC line as its own, but also actively attempted to deceive potential customers by removing any indicia (including certain stickers) that Universal had actually produced the furniture. Because such conduct is unethical and has a strong tendency to deceive, we must affirm the court's conclusion that Collezione contravened the UDTPA. *See Harrington Mfg. Co. v. Powell Mfg. Co.*, 248 S.E.2d 739, 746 (N.C. Ct. App. 1978) (concluding that UDTPA is violated where defendant used plaintiff's "actual product in demonstrations to potential customers, [and] at the same time falsely represent[ed] . . . that the product had been manufactured by" the defendant).

### D.

Finally, Collezione challenges the district court's award of damages, maintaining that the court erred when it rejected proof of deductible expenses and instead awarded damages to Universal in an amount equal to Collezione's gross revenue from sales of the 20000 and 20200 collections.

A "copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement,

and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." 17 U.S.C. § 504(b). "In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." *Id.* In other words, "[o]nce the copyright owner has established the amount of the infringer's gross revenues, the burden shifts to the infringer to prove either that part or all of those revenues are 'deductible expenses' (i.e., are not profits), or that they are 'attributable to factors other than the copyrighted work.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 520 (4th Cir. 2003) (internal citation omitted).

Following its three-day damages inquiry in June 2008, the district court issued its Damages Opinion, determining that Collezione received gross revenues of $4,633,621.26 from its infringing 20200 collection and $6,695,155.92 from its infringing 20000 collection. The court also found that Collezione's infringement was willful. During discovery, Collezione was asked to produce a Rule 30(b)(6) deponent who could testify to the company's gross profits and deductible expenses and to the methodology for calculating deductible expenses. Collezione designated its chief financial officer, Paul Frankel, who was unable to provide these calculations. Frankel asserted that there were no documents in existence from which gross profits on the 20000 or 20200 could be calculated. Further, he stated that no one in the company had calculated net profits on the collections as of that date. Shortly before trial, Collezione managed to produce a summary of its profit calculations, which Frankel characterized as "[r]easonably accurate," though he was not "sure." J.A. 1139, 1155. After the damages inquiry, the court ordered Collezione to submit revised calculations, which the court later found noncompliant because the summary was unreliable and inconsistent with Frankel's testimony. Importantly, the court found

that "Collezione's submissions demonstrate its calculation of total sales increased between summary judgment and trial, but its net profit calculation inexplicably decreased." Damages Opinion 19. The court thus concluded that Collezione had failed to meet its burden of proving deductible expenses because it "presented methods of calculating costs which are confusing, unreliable, and internally inconsistent." *Id.* at 12. Further, Collezione's delay in producing the first summary until shortly before trial hampered Universal's ability to investigate its accuracy.

The district court applied the correct legal standard when it required Universal to establish Collezione's gross profits from the infringement and then shifted the burden to Collezione to prove its deductible expenses. Moreover, we discern no clear error in the court's conclusion that Collezione failed to meet this burden. The court's comprehensive findings were based on its extensive examination of the parties' presentations and on the credibility of witnesses, particularly the equivocal testimony of Frankel. These factual findings are entitled to our deference.

Nor did the district court abuse its discretion by rejecting Collezione's proffered calculations as unreliable. Collezione was given several opportunities to offer reliable proof of deductible expenses, yet repeatedly failed to do so. Its appellate contention that the "[d]istrict court, as the finder of fact . . . should have reviewed the documents and calculated gross and net profits for each of the infringing pieces of furniture," Br. of Appellant 65, demonstrates a gross misunderstanding — it is the *infringer's* burden to prove deductible expenses. 17 U.S.C. § 504(b). Finally, the court did not err by finding that Collezione's infringement was willful, particularly given Collezione's admission that it initially set out to imitate Universal's GIC and EMC lines and its display of Universal's furniture at the October 2004 High Point market.

## IV.

For these reasons, we affirm the district court's judgment on liability and damages.[9]

*AFFIRMED*

---

[9]Collezione claims that the Injunction is overbroad because it applies to furniture within the 20000 and 20200 collections that the district court did not find to infringe Universal's GIC and EMC copyrights. In particular, Collezione maintains that it sells entertainment centers (other than the infringing 20000 armoires) and desks within these collections, and that Universal does not sell desks or entertainment centers as part of the EMC or GIC. Br. of Appellant 70. Universal did not respond to this argument. We assume that there can be no infringement of nonexistent pieces of Universal's furniture. Consequently, we affirm the permanent injunction only for the furniture within Collezione's 20000 and 20200 lines that actually infringes Universal's copyrights.