**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 10-1253**

PAUL MORRELL, INCORPORATED, d/b/a The Event Source,

Plaintiff - Appellee,

v.

KELLOGG BROWN & ROOT SERVICES, INCORPORATED; KELLOGG BROWN &
ROOT INTERNATIONAL, INCORPORATED; KELLOGG BROWN & ROOT,
INCORPORATED; KELLOGG BROWN & ROOT, LLC,

Defendants – Appellants,

and

KBRI TX-1 NEWCO, INCORPORATED; KELLOGG ENERGY SERVICES,
INCORPORATED; KELLOGG BROWN & ROOT (CALIFORNIA),
INCORPORATED,

Defendants.

Appeal from the United States District Court for the Eastern
District of Virginia, at Alexandria. Anthony J. Trenga,
District Judge. (1:08-cv-00072-AJT-JFA)

Argued: September 22, 2011          Decided: November 10, 2011

Before NIEMEYER, KING, and AGEE, Circuit Judges.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Warren W. Harris, BRACEWELL & GIULIANI, LLP, Houston,
Texas, for Appellants.  Mark David Crawford, MCMANUS & DARDEN,

LLP, Washington, D.C., for Appellee. **ON BRIEF:** Jeffrey L. Oldham, BRACEWELL & GIULIANI, LLP, Houston, Texas, for Appellants. Jeanne A. Anderson, MCMANUS & DARDEN, LLP, Washington, D.C.; Laurence Schor, ASMAR, SCHOR & MCKENNA, PLLC, Washington, D.C.; Monica Taylor Monday, GENTRY LOCKE RAKES & MOORE, Roanoke, Virginia, for Appellee.

———————————

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Plaintiff/Appellee Paul Morrell, Incorporated, d/b/a The Event Source ("TES") brought suit in the United States District Court for the Eastern District of Virginia against Defendants/Appellants Kellogg Brown & Root Services, Incorporated and several related entities ("KBR"), alleging various common law claims. Prior to trial, a number of the claims were either dismissed or resolved between the parties. After a multi-week bench trial on the remaining claims, the district court ruled against TES on its claims for breach of contract and tortious interference,[1] but in favor of TES on its claim for fraudulent inducement, setting forth detailed findings of fact and conclusions of law in a 47-page written opinion. The court awarded approximately $12.4 million in fraud damages, slightly more than $2.5 million in prejudgment interest, and $4 million in punitive damages.

On appeal, KBR challenges the district court's judgment on the fraud claim, as well as the award of both compensatory and punitive damages. For the reasons set forth herein, we affirm the judgment of the district court.

---

[1] Those rulings are not at issue in this appeal.

I.

This case arises out of a contract and subsequent settlement agreement between KBR and TES. The district court determined that KBR made material false statements in order to induce TES to accept a settlement payment that was approximately $12.4 million less than what KBR had previously acknowledged it owed TES.

The initial contract between KBR and TES was part of the effort to provide dining facilities and food services ("DFAC services") to American troops in Iraq. That effort began in December 2001, when KBR contracted with the federal government to provide logistical support, including DFAC services, to our armed forces in Iraq. On June 13, 2003, actual work authorization was awarded to KBR through Task Order 59, and KBR selected TES as a sub-contractor to provide certain of those services. TES and KBR entered into a Master Agreement on June 15, 2003, which contained a number of incorporated contractual documents. TES, in turn, hired a number of sub-contractors to perform various aspects of the required work, setting up separate payment arrangements with each of them. The time of performance under Task Order 59 was modified periodically and additional funding was provided as the need for DFAC services in Iraq continued.

4

Toward the end of 2003, KBR came under scrutiny from the Defense Contract Audit Agency ("DCAA"), which was investigating the DFAC invoices KBR submitted for payment from its subcontractors. One of DCAA's primary concerns was that some DFAC invoices, including those from TES, billed for more meals than were actually served to the troops. In early 2004, DCAA began reviewing its payment of invoices to KBR, and informed KBR that, pending further discussions, DCAA would withhold payment on a portion of the invoices.[2] DCAA also instructed KBR to review all of its DFAC subcontracts.

KBR conducted the review of its subcontracts, and informed DCAA that its review confirmed that its subcontracts were reasonably priced and structured, and that outstanding invoices should be paid in full. KBR thus told DCAA that it intended to

---

[2] DCAA had concluded it was not obligated to pay KBR for invoiced meals that exceeded the actual number of soldiers served. However, that arrangement between DCAA and KBR was inconsistent with the terms of the competitively-bid subcontract between TES and KBR. In the subcontract, KBR agreed that TES was entitled to charge for a minimum number of meals, regardless of the number of persons actually served at a site. This pricing scheme was considered reasonable by both KBR and TES since it was intended to allow TES to recover, within the initial performance period, all of its initial expenditures (such as capital costs for facilities and equipment) which were considerable and not likely recoverable on an actual per person charge rate. This ability to recoup capital costs was a substantial inducement by KBR for TES to enter into the subcontract.

5

pay outstanding invoices to its subcontractors in full and bill those amounts to the government.

In response to KBR's stated intention, DCAA announced in May 2004 that it would begin to withhold and/or recoup 19.35% of the total payments made by the government to KBR for DFAC invoices because of the discrepancy between the actual number of meals served and the invoiced meal amounts. This "decrement" caused KBR, in turn, to withhold money from its subcontractors. Additionally, in response to the imposition of the decrement, KBR and TES executed Amendment No. 1 to the Master Agreement, which reflected their agreement as to the proper method to calculate the amount due and payable to TES, later agreed by them to be $36,464,644.65. Amendment No. 1 also extended the time for TES to file contract dispute claims with KBR.

In early 2005, KBR met with the Army Sustainment Command ("ASC"), to discuss the government's continued concerns regarding the alleged overbilling, and they engaged in extensive renegotiations over the DFAC billing and invoices. ASC and KBR finally reached a negotiated settlement ("the KBR-ASC Settlement"), in which KBR agreed to a $55 million decrement from the invoice amounts it had submitted from its DFAC subcontractors and released the government from all claims relating to the DFAC invoices. As a result, KBR no longer had the ability to assert claims on behalf of its subcontractors for

6

any additional payment for DFAC services, and the sole remedy for TES and other subcontractors was against KBR. KBR did not consult with TES or its other sub-contractors regarding the KBR-ASC Settlement, nor did it disclose any of the settlement details to TES. In any event, TES never authorized KBR to waive any of TES' rights vis a vis the government under its subcontract with KBR.

Following the KBR-ASC Settlement, KBR scheduled meetings in Dubai with TES and other subcontractors in order to resolve their outstanding invoices which had been subject to the decrement. During the Dubai meetings, KBR convinced TES to accept a reduced payment from KBR on its invoiced amounts (approximately $24 million, instead of the $36.4 million agreed to in Amendment No. 1) and to release KBR from any additional claim for payment.

TES' fraud claim was based on the representations made by KBR before and during the Dubai meetings. The dispute over the fraud claim at trial focused primarily on whether the Dubai representations by KBR were knowingly false, and whether TES justifiably relied on those representations when it accepted the reduced payment from KBR and released it from further claims.

The district court found that KBR officials made numerous fraudulent statements to TES in order to induce TES to agree to the reduced payment and the release. These misrepresentations

7

by KBR included: (1) the characterization of the amount KBR was going to pay TES as a "Government decision," that was "calculated by the Government based on a number of factors, primarily including actual headcount and the period of performance"; (2) "that KBR has no ability to increase or decrease the KBR Holdback," defined as "that portion of the amount billed for the Invoiced Work that will not be paid to TES as determined by the Government"; (3) that KBR had no discretion to raise or lower the amount offered, which was therefore "non-negotiable"; and (4) if TES rejected the KBR offer, "TES' only legal remedy was to contest the government's decision by filing a claim, through KBR, against the government." (See J.A. 2379-82.)

Many of KBR's fraudulent statements were made orally, but some were incorporated into a written document, Amendment No. 2 to the Master Agreement. Significantly, the district court expressly found that TES asked KBR to sign Amendment No. 2 in order to verify that KBR was being truthful about its representations.

The district court further found that, had KBR not executed Amendment No. 2, TES would not have agreed to accept the reduced payment. Instead, it would have sued and could have recovered from KBR the full amount KBR had previously acknowledged was due, the $36.4 million. The district court thus found that TES

8

was entitled to damages in the amount it released in the settlement with KBR, i.e., $12,424,387.

On appeal, KBR assigns error to three rulings by the district court: (1) the district court's finding that TES actually and justifiably relied on KBR's misrepresentations; (2) the district court's award of compensatory damages for the fraud; and (3) the district court's determination that punitive damages were proper.[3] KBR timely filed its appeal and we have jurisdiction pursuant to 28 U.S.C. § 1291.

II.

A.

When a judgment results from a bench trial, it is reviewed "under a mixed standard of review—factual findings may be reversed only if clearly erroneous, while conclusions of law . . . are examined de novo." Universal Furniture Int'l v. Collezione Europa USA, 618 F.3d 417, 427 (4th Cir. 2010)

---

[3] Because KBR has not identified as a separate issue on appeal or offered any argument in support of a claim that the district court erred in finding that the false statements were made or that they were material, we deem any such challenges abandoned. See Fed. R. App. P. 28(a)(9)(A) ("appellant's brief must contain . . . appellant's contentions and the reasons for them"); Jones v. Liberty Mut. Ins. Co. (In re The Wallace & Gale Co.), 385 F.3d 820, 835 (4th Cir. 2004) (where a party does not comply with Rule 28 and fails to address a claim, the claim is waived).

9

(quoting Roanoke Cement Co. v. Falk Corp., 413 F.3d 431, 433 (4th Cir. 2005)) (alteration in original). Under the clear error standard, the court of appeals must affirm factual findings if they are "plausible" in light of the entire record, "even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." Walton v. Johnson, 440 F.3d 160, 173 (4th Cir. 2006).

B.

In this diversity jurisdiction case, the parties are in agreement that Texas law governs the common law claims asserted. Under Texas law, TES' fraudulent inducement claim required it to prove, among other elements, that it justifiably relied on KBR's misrepresentations when entering into the settlement agreement. Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co., 51 S.W.3d 573, 577 (Tex. 2001). The district court found that TES proved its reliance was justifiable. Specifically, the district court found:

> TES' willingness to enter into Amendment No. 2 was related directly to KBR's misrepresentations. KBR's representation that the government unilaterally determined the amount to be paid to TES and its repeated references to the Disputes Clause caused TES to conclude that if TES were to seek more than what KBR was offering, TES' only remedy would be against the government. For a variety of reasons, TES was not willing to litigate against the government . . . . [But] TES was fully prepared to pursue KBR, including through litigation, if necessary, over its outstanding

10

DFAC invoices since, among other reasons, KBR had already acknowledged the amount that was properly payable to TES. TES questioned the accuracy of KBR's representations and, in response, KBR labeled as inaccurate certain news reports concerning a "settlement" with the government. KBR also provided written confirmation of certain of its representations in order to dispel any misgivings on TES' part. TES specifically conditioned its willingness to accept KBR's settlement offer and its willingness to release KBR based on receiving those assurances and entered into Amendment No. 2 only after receiving KBR's representations through KBR's legal counsel. While certain of TES' officers suspected that certain of KBR's representations were untrue (while others, such as its general counsel, did not), TES did not, in fact, know at the time, and had no means of determining, that KBR's representations were untrue and it took reasonable steps, because of its suspicions, to ensure that they were true.

(J.A. 2387–88.)

The parties dispute the proper standard of review on this issue. KBR argues that justifiable reliance in this case is a legal issue that should be reviewed de novo. Citing Grant Thornton, LLP v. Prospect High Income Fund, ML CBO IV (Cayman), Ltd., 314 S.W.3d 913 (Tex. 2010), KBR contends that the issue should be determined as a matter of law because there were "red flags" in the case such that TES was alerted to the falsity of KBR's representations, thereby rendering its reliance unjustified. See id. at 923 ("a person may not justifiably rely on a representation if there are red flags indicating such reliance is unwarranted.") (internal quotation marks and citation omitted). KBR also points to the testimony of some of

11

TES' agents, involved in the negotiations with KBR, who stated that they had concerns about the truthfulness of the representations being made to them. Because of these "red flags," KBR argues, TES' reliance was not justifiable as a matter of law. KBR thus urges us to review the determination de novo.

While there are cases in which justifiable reliance can be determined as a matter of law, this is not one of them. See 1001 McKinney Ltd. v. Credit Suisse First Boston Mortg. Capital, 192 S.W.3d 20, 30 (Tex. App. 2005) (collecting authority and noting that Texas state and federal "courts have uniformly treated the issue of justifiable reliance as a question for the factfinder"); id. at 35 (Frost, J., concurring and dissenting) (noting that reliance may be determined as a matter of law, but also recognizing that "i[f] there is a genuine issue of material fact as to whether reliance was justifiable in a common-law fraud case, then, of course, the factfinder should determine this issue"). Instead, in this case, there are facts that could support a conclusion either way. Thus, which version of events to credit here was determined by the district court as a factual matter based on its first-hand knowledge of the evidence and its credibility determinations of the witnesses. We therefore agree with TES that the justifiability of its reliance in this case is a factual finding that we review only for clear error.

12

The district court's finding was not clearly erroneous. Although KBR argues the existence of any "red flags" should end the inquiry, the district court concluded that it was precisely because of the purported "red flags," i.e., TES' concerns, that TES sought additional reassurances and particularly why it sought assurances from KBR in writing. The record contains ample support for the factual finding that TES justifiably relied on KBR's misrepresentations. For example, members of TES' Dubai team testified regarding the importance of KBR's representations in TES' decision-making process. They also emphasized that both KBR's lead negotiator, retired three-star Army General Paul Cerjan, and KBR's lawyer, told TES that any dispute over the payments would be with the government, and that KBR did not know how site-specific numbers were reached. Additionally, KBR denied it had negotiated with the government and told TES that media reports to the contrary were inaccurate. There was also testimony from TES that it would not have settled without KBR's written assurances of its representations.

Particularly in light of the district court's opportunity to observe the witnesses and assess credibility, we conclude that the district court's finding of reliance here is certainly "plausible" in light of the entire record. Cf. Walton, 440 F.3d at 173. Thus, we find no clear error.

KBR's second assignment of error is that the district court erred in finding that TES was entitled to damages in the amount of $12,424,387. We review the district court's legal rulings as to the damages award de novo and its factual finding as to the amount of damages for clear error. Universal Furniture Int'l, 618 F.3d at 427.

In order to recover damages on its fraud claim, TES was required to prove that KBR's acts or omissions were a cause-in-fact of TES' foreseeable losses. Prospect High Income Fund, ML CBO IV (Cayman), Ltd. v. Grant Thornton, LLP, 203 S.W.3d 602, 618 (Tex. App. 2006), rev'd on other grounds, Grant Thornton, LLP, supra, 314 S.W.3d 913. KBR advances several theories challenging the damages award. We have reviewed them and do not find any persuasive.

KBR's primary argument is that TES could not have recovered any more than what it received in exchange for the release, due to the "pay-when-paid" clause in Paragraph 3.1.4 of the General Conditions of the Master Agreement:

> Notwithstanding any other provision hereof, payment by [the government] to [KBR] is a condition precedent to any obligation of [KBR] to make payment hereunder. [KBR] shall have no obligation to make payment to [TES] for any portion of the Sublet Work for which [KBR] has not received payment from [the government].

14

(J.A. 107.) Additionally, Amendment No. 1 to the Master Agreement between KBR and TES acknowledged the continuing validity of the pay-when-paid clause.

It is not entirely clear from the district court's opinion whether it was treating the provision merely as a timing of payment provision or as a condition precedent. In any event, we need not decide either (1) whether the provision was a condition precedent;[4] or (2) if so, whether that condition was satisfied by the partial payment to KBR pursuant to the KBR-ASC Settlement.[5]

---

[4] The contract itself describes the provision as a "condition precedent." (J.A. 107.) Additionally, in Amendment No. 1, the language used is that payment is "conditioned on" payment to KBR by the government. (J.A. 123.) See Gulf Constr. Co. v. Self, 676 S.W.2d 624, 627 (Tex. App. 1984) ("While no particular words are necessary for the existence of a condition, such terms as 'if,' 'provide that,' 'on condition that,' or some other phrase that conditions performance usually connote an intent for a condition rather than a promise.").

[5] KBR argues that because it was not paid by the government for the $12 million that TES now seeks, the condition precedent was not satisfied. That is, of course, a simplistic view. As pointed out by TES, the KBR-ASC Settlement was a global one for all of KBR's invoices, and did not dictate that any subcontractor be paid any specific amount. Moreover, TES as a subcontractor, was not a party to the agreement between KBR and the government in the KBR-ASC Settlement. Indeed, KBR's internal documents discussing how to negotiate with TES and other subcontractors clearly recognized that

> [i]f vendors [such as TES] don't accept the settlement and sue for recovery, we will probably have to turn over USG documents and the vendors will see the different settlement per [Task Order] . . . If they prevail, we may have to pay them the 'over recovery'

(Continued)

15

Even if the pay-when-paid clause was a condition precedent and it was not satisfied by the partial payment by the government to KBR, we agree with the district court that the prevention doctrine would not allow KBR to rely on that condition to avoid payment to TES of the amounts due.

The prevention doctrine, an equitable principle, bars a party from relying on a condition precedent where that party's own wrongful conduct has prevented the condition from being met. See Sanderson v. Sanderson, 109 S.W.2d 744, 749 (Tex. Comm'n App. 1937) (referring to the "universal maxim that, where the obligation of a party depends upon a certain condition being performed, and the fulfillment of that condition is prevented by the act of the other party, the condition is considered as fulfilled") (quotation marks and citation omitted).

As explained by the district court, "the KBR-ASC [S]ettlement did not limit TES' recovery against KBR on its DFAC invoices given the manner in which KBR chose to enter into that settlement." (J.A. 2399.) In particular, by entering into the settlement with ASC, KBR essentially preempted any government decision and, further, could not have pursued TES' claims

---

and will have no way to recover it from other vendors who haven't sued us."

(J.A. 2597.)

16

against the government on TES' behalf. Despite this, KBR led TES to believe that a "decision" had been made as to the amounts payable to TES, even going so far as to reference Section 3.0 in its letter notifying TES of a government "decision." (See J.A. 2607.)[6] KBR's general counsel also testified at trial that the reference to Section 3.0 in that letter conveyed that any remedy by TES was against the government, not KBR, and the district court so found.

The district court thus reasoned:

The "pay when paid" provision of the Master Agreement was inextricably bound up with TES' rights against the government in the event of a dispute. KBR's actions eliminated TES' rights to seek additional payments on its outstanding DFAC invoices and now prevent KBR from relying on the "pay when paid" provision of the Master Agreement.

(J.A. 2400-01.)

We find no error in the district court's application of the prevention doctrine. That is, KBR acted wrongfully because, while agreeing the government did not have to pay KBR for the

---

[6] Section 3.0 of the Special Conditions, titled "Disputes," states that "Notwithstanding any other provision in this SUBCONTRACT," any decision of the government is binding on TES only if KBR notifies TES of the decision and, if requested by TES, "appeals the decision in accordance with the Disputes clause of the Prime Contract." (J.A. 118.) According to the contract documents, in the event of a conflict between contract provisions, the Special Conditions, where Section 3.0 falls, "take precedence" over the General Conditions, where the pay-when-paid clause appears. (J.A. 114.)

17

full amount TES invoiced, it also gave away, without notice, TES' rights to pursue further payment against the government through KBR, thereby preventing occurrence of the condition precedent. It then falsely represented to TES that TES had no remedy against KBR. As TES succinctly argues: "KBR was not at liberty to fundamentally alter the contractual disputes and payment process and then still rely upon a contractual defense that presupposes the existence of that process." (Br. of Appellee at 48.) Accordingly, KBR's own conduct prevented it from relying on the pay-when-paid clause. See Moore Bros. Co. v. Brown & Root, Inc., 207 F.3d 717, 725 (4th Cir. 2000) (where the general contractor's wrongful actions "'contributed materially' to the non-occurrence of the condition precedent," the contractor could not rely on the pay-when-paid defense to bar the plaintiff's recovery) (citing Restatement (Second) of Contracts § 245 (1981) cmt. b);[7] Urban Masonry Corp. v. N&N

---

[7] KBR argues that Virginia law, applicable in Moore Bros. is materially different law, but the prevention doctrine appears substantially similar in Virginia and Texas. Compare, e.g., Moore Bros., 207 F.3d at 725 (setting forth Virginia law and relying on Restatement (Second) of Contracts § 245) with Sanderson, 109 S.W.2d at 749 (referring to the "universal maxim that, where the obligation of a party depends upon a certain condition being performed, and the fulfillment of that condition is prevented by the act of the other party, the condition is considered as fulfilled") (quotation marks and citation omitted); Heritage Life Ins. Co. v. Heritage Grp. Holding Corp., 751 S.W.2d 229, 234 (Tex. App. 1988) (citing Restatement (Second) of Contracts § 245 for same). Cf. Clear Lake City Water (Continued)

18

<u>Contractors, Inc.</u>, 676 A.2d 26, 36 (D.C. 1996) (in dispute between subcontractor and general contractor, a walk-away settlement between the owner and general contractor either satisfied condition of "pay if paid" clause (because it constituted sufficient "payment"), or, by settling without securing outstanding payments for the sub-contractor, the general contractor willfully hindered satisfaction of the condition precedent and could not rely on it).

Having found that KBR could not rely on the pay-when-paid clause to bar TES' recovery, we conclude that the amount of damages determined by the district court was not clearly erroneous. The KBR-TES Settlement induced by fraud reduced the agreed-upon amount KBR owed TES by $12,424,387 and an award in that amount as compensatory damages was not error. We therefore affirm the district court's award of damages to TES on its fraud claim.

---

<u>Auth. v. Friendswood Dev. Co.</u>, 344 S.W.3d 514, 520 (Tex. App. 2011) (noting that Section 245 of the Restatement has not been adopted by the Texas Supreme Court, but citing the general rule that "a party who 'prevents or makes impossible' the occurrence of a condition precedent upon which its liability under a contract depends cannot rely on the nonoccurrence to escape liability").

19

D.

In addition to awarding TES compensatory damages on its fraud claim, the district court also awarded punitive damages in the amount of $4 million.  KBR does not challenge the amount of punitive damages, but instead contends that TES failed to prove its fraud claim by the stringent "clear and convincing evidence" standard, as required to award punitive damages under Texas law. See Tex. Civ. Prac. & Rem. Code Ann. § 41.003 (West 2010) (punitive damages permitted where each element of a plaintiff's fraud claim is proved by clear and convincing evidence); Foley v. Parlier, 68 S.W.3d 870, 879-80 (Tex. App. 2002).  Clear and convincing evidence is a "degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."  Tex. Civ. Prac. & Rem. Code Ann. § 41.001(2) (West 2003).

As an initial matter, we note that the district court applied the proper standard and recited that it found each element of the fraud claim had been proven by clear and convincing evidence.  It also described KBR's conduct as

> part of a well orchestrated and thought-out plan, reviewed by its management before being implemented, in order to eliminate KBR's legal exposure for tens of millions of dollars in additional liability . . . . Organizationally, KBR devised a scheme that was intended to conceal accurate information from TES, even to the point of concealing accurate information from certain of its own employees who were selected because of their professional stature to convey false

20

information to TES. . . . Having made the decision to resolve its contractual dispute with the government without the knowledge or participation of TES, KBR was then not free to misrepresent what had happened in order to eliminate its own remaining legal exposure to TES.

(J.A. 2403-04.)

This direct language from the district judge, who observed the witnesses at trial, shows that the court was not merely giving lip service to the clear and convincing standard, but in fact held "a firm belief or conviction" that TES proved its fraud claim against KBR. Cf. Tex. Civ. Prac. & Rem. Code Ann. § 41.001(2). Accordingly, the district court's award of punitive damages is affirmed.

## III.

For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED

21