PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

F.C. WHEAT MARITIME
CORPORATION; WHEAT
INTERNATIONAL COMMUNICATIONS
CORPORATION,

     *Plaintiffs-Appellants,*

     and

FEDERAL INSURANCE COMPANY,

     *Plaintiff,*

     v.

UNITED STATES OF AMERICA,

     *Defendant-Appellee.*

No. 10-1906

Appeal from the United States District Court
for the Eastern District of Virginia, at Norfolk.
Raymond A. Jackson, District Judge.
(2:09-cv-00093-RAJ-FBS)

Argued: October 25, 2011

Decided: December 14, 2011

Before SHEDD and DUNCAN, Circuit Judges, and
William L. OSTEEN, Jr., United States District Judge for
the Middle District of North Carolina, sitting by designation.

---

Affirmed by published opinion. Judge Duncan wrote the opinion, in which Judge Shedd and Judge Osteen joined.

**COUNSEL**

Patricia Ann Smith, LAW OFFICES OF PATRICIA A. SMITH, Alexandria, Virginia, for Appellants. Sarah Keast, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

---

**OPINION**

DUNCAN, Circuit Judge:

This appeal arises out of a case involving an allision[1] between a United States Army Corps of Engineers ("USACE") vessel and a private yacht, the Marquessa, owned by F.C. Wheat Maritime Corp. ("Wheat Maritime") and operated by its parent company Wheat International Communications Corp. ("Wheat International"). Wheat Maritime and

---

[1]"An allision is a collision between a moving vessel and a stationary object." *Evergreen Int'l., S.A. v. Norfolk Dredging Co.*, 531 F.3d 302, 304 n.1 (4th Cir. 2008) (quoting Thomas J. Schoenbaum, *Admiralty & Maritime Law* § 5-2 n.1 (4th ed. 2004)). *See also* Black's Law Dictionary 88 (9th ed. 2009) (defining an allision as "[t]he contact of a vessel with a stationary object such as an anchored vessel or a pier"). The Marquessa was stationary at the time of the incident in this case.

*Black's* explains, however, that "collision" is often used where "allision" was once the preferred term. *Black's Law Dictionary* at 88. And as the Fifth Circuit has noted, "[i]n modern practice, courts generally use the term 'collision' as opposed to 'allision' when describing contact between vessels that gives rise to a suit." *Apache Corp. v. Global Santa Fe Drilling Co.*, No. 10-30795, 2011 WL 2747575, at *1 n.1 (5th Cir. Jul. 13, 2011)(unpublished). Indeed, the district court here used the term collision.

We adhere to the more precise usage, and are particularly mindful that admiralty law draws a distinction (albeit not one relevant to this appeal) between allisions and collisions. *See Bessemer & Lake Erie R.R. Co. v. Seaway Marine Transp.*, 596 F.3d 357, 362 (6th Cir. 2010) (noting that admiralty law establishes a rebuttable presumption that in an allision, the moving object is at fault).

Wheat International (collectively, "Appellants") brought suit against the United States. The case proceeded to a bench trial in the district court, resulting in a damages judgment for Appellants. Appellants appeal from the district court's award of damages in their favor, arguing that it is infirm in various respects. For the reasons that follow, we affirm.

## I.

## A.

The Marquessa was originally built in 1982 as a 58-foot Bertram motor yacht, but like many vessels of her kind, was subsequently extended. After the extension, the Marquessa measured 70' from bow to transom, with an additional four-foot swim platform extending beyond the transom. Wheat Maritime purchased the Marquessa in 1998 for $875,000 and made numerous modifications.[2] Wheat Maritime ultimately chartered the vessel to Wheat International. Forrest Wheat owns both Wheat Maritime and Wheat International.

On February 2, 2008, a USACE vessel allided with the Marquessa, which was docked at a pier at Ocean Marine marina in Portsmouth, Virginia. The allision occurred because the USACE vessel's captain fell asleep at the helm. The Marquessa was damaged significantly. Appellants brought the underlying action against the United States under the Public Vessels Act, 46 U.S.C. § 31101 et seq., and the Suits in Admiralty Act, 46 U.S.C. § 30901 et seq., in the United States District Court for the Eastern District of Virginia.

---

[2]The modifications consisted of (1) adding a heating furnace and enclosing the flybridge for cold weather operation, (2) replumbing and sanitation work, (3) rebuilding and upgrading engines to ensure compliance with regulations, (4) adding a bow thruster, and (5) electrical alterations.

## B.

The United States admitted liability for the allision. The matter proceeded to a bench trial on the issue of damages. Appellants and the United States presented evidence regarding the reasonable costs of repairing the Marquessa as well as her fair market value at the time of the accident. The parties did so because, as we discuss in greater detail in the next subsection, damages determinations in admiralty are governed by the doctrine of constructive total loss. Under that doctrine, where the costs of repairing a vessel exceed her pre-casualty fair market value, damages are limited to fair market value.

### 1.

#### a.

We now turn to a consideration of each component of constructive total loss. With respect to repair costs, Appellants argued that they were entitled to $1,117,859.67. This figure derives from two sources. First, Appellants relied upon an estimate from the shipyard, Ocean Marine, for $784,000 in actual repair costs. Second, Appellants contended the additional $333,859.67 was necessary to account for other related expenses: the cost of replacing certain items that were on board the Marquessa, such as certain satellite antennas and laptop computers owned by Wheat International; the cost for the captain to be aboard during all shipyard work; travel expenses to inspect the repairs; and storage costs. Appellants' evidence with respect to these related expenses was limited. For example, they presented no evidence that the antennas were visually inspected for damage, or tested. Similarly, Appellants presented an estimate of the amount required to replace the laptops, but presented no evidence that they first sought to determine whether the laptops were repairable.

#### b.

Three experts testified regarding the Marquessa's fair market value, relative to her cost of repair. Two of the witnesses,

Jack Hornor, the United States' expert, and Val Lippa, who testified for Appellants, were marine surveyors. Gregory Pierce, who testified for Appellants, was a yacht broker.

Hornor, who has been surveying vessels since 1971 and is certified as a marine surveyor by the National Association of Marine Surveyors,[3] testified that the Marquessa's market value was $440,000. Hornor based his assessment on his inspection of the vessel, a review of a database of sales of comparable vessels, and an evaluation of the features that added to or detracted from the vessel's value. According to Hornor, the database in question, soldboats.com, is the source used most often in the industry and is generally relied upon in the field. From this website, Hornor identified seven sales of similar vessels, all of which, like the Marquessa, started life as 58' Bertrams, were extended 10-12" just as the Marquessa, and sold at various times for between $275,000 and $695,000.

Hornor opined that although some of the modifications enhanced the vessel's value, many did not. He testified that the replumbing and sanitation work did not increase the vessel's comparable value because it was mandated by law and expected on a boat such as the Marquessa. He explained that the heating furnace did not increase the value of the boat because boats of her size and class are expected to have heat and air conditioning. Wheat's electrical alterations, he noted, were of similarly limited importance. The number of rooms on the Marquessa did not increase the value of the vessel compared to the comparables, he stated, as the interior vol-

---

[3]This certification requires a five-year apprenticeship, a minimum level of experience conducting surveys, a day-long examination, and Board approval. Hornor is also certified in standards and in systems by the American Boat and Yacht Council, and sits on that body's board of directors. He has published over 220 articles in his field. Over the course of his career, he has determined the market value of 1200 to 1500 vessels, and he has evaluated the reasonable repair costs of a vessel following a marine casualty on several thousand occasions.

ume in the extended Bertram yachts was generally the same, and dividing up the space into five rooms instead of the typical three results in very small rooms. Hornor testified that the Marquessa's larger flybridge contributed little because, should the flybridge actually be used to hold additional people, the extra weight at that height could significantly decrease the vessel's stability. Finally, he noted that the four-foot swim platform, which is irrelevant for purposes of determining a vessel's length (as defined by Coast Guard standards), also did not make the Marquessa so unique that she could not be compared to the other extended Bertrams.

Moreover, Hornor opined, any increase in the Marquessa's value resulting from the improvements was offset by the condition of the vessel's exterior and her age. Hornor placed particular emphasis on the paint, noting that the condition of the finish of a vessel can be a substantial factor in establishing the vessel's value. Hornor stated that the paint used on yachts of this type has a maximum lifespan of ten years, in the best of conditions. Hornor stated that the painting was not completed to yacht-quality standards, leaving the Marquessa's finish with the texture of an "orange peel" in places. He further testified that the hull also showed patches of non-matching paint from spot repairs and refinishing, as well as a "halo effect" that can result from spot refinishing. The government introduced into evidence photographs reflecting the patchwork effect and halos. With respect to the cost of repairing the Marquessa, Hornor testified that reasonable cost would be in the range of $460,000 to $470,000.

Lippa, also an accredited marine surveyor,[4] was called by Appellants to testify as to the costs of repair. Similar to Hornor, Lippa opined that the Marquessa's market value was $470,000.[5] Lippa based this figure on examining the vessel

---

[4]Lippa is a Member of the Society of Accredited Marine Surveyors. He has surveyed recreational vessels for nine years. He surveyed vessels in the United States Navy for four years prior to that.

[5]Having called Lippa to testify regarding the costs of repairing the Marquessa, Appellants objected to the government's questioning him regard-

and using the same subscription website as Hornor did. Lippa further opined that the Marquessa was a constructive total loss, in that the costs of repairing the vessel exceeded her market value.

Pierce, on the other hand, departed significantly from the opinions of Hornor and Lippa in setting the market value of the Marquessa at the time of the allision at $900,000. Pierce, a yacht broker, stated that he represented Wheat during his purchase of the Marquessa, and advised about her over the years. He estimated having visited her fifty times or more. According to Pierce, these visits were primarily social occasions, and he acknowledged receiving much of his information about the vessel from Wheat. Pierce testified that he arrived at his valuation based on a review of market listings of asking prices in early 2008, as well as a later review of asking prices for 80-foot Hatterases in January 2009. He specifically identified only one sold vessel as a comparable—an 82-foot Hatteras that sold for $875,000, almost double the price of boats of similar size and vintage, because of her customer improvements. As a yacht broker and not a marine surveyor, Pierce described his valuation process as, "Not very scientific and certainly not a lot of weight in a courtroom, but it's what I did." J.A. 237.

2.

At the conclusion of trial, the district court issued a comprehensive opinion containing its factual findings and legal conclusions. To a considerable extent, the district court's findings of fact were grounded in credibility determinations.

---

ing "the Marquessa's preloss actual cash value" as "exceed[ing] the scope of his expertise in this case." J.A. 182. The district court, however, ruled that it would allow the testimony because "he's talking about the cost of repair and what needs to be repaired." J.A. 183.

a.

First, the district court found that Hornor and Lippa were more credible than Pierce. Consequently, it agreed with the assessment of both surveyors that the Marquessa was a constructive total loss because the cost of repairs exceeded her market value.[6] Second, crediting Hornor's (and to some extent Lippa's) testimony, the district court found the market value of the Marquessa at the time of the allision to be $440,000.

The district court further concluded that Hornor's methodology for computing the Marquessa's market value was the most sound and comprehensive. In reaching this conclusion, the district court found no reason to question the accuracy of the soldboats.com database. The district court held that both Hornor and Lippa had inspected the vessel extensively and could assess her value and condition. And the district court agreed, based on Hornor's testimony and the photographs in evidence, that the vessel was in worse condition than Appellants claimed.

The district court noted that Lippa was Appellants' expert surveyor, and that Lippa and Hornor found the value of the Marquessa to be $470,000 and $440,000 respectively—in stark contrast to Pierce's figure of $900,000. The district court doubted Pierce's estimate because of his personal relationship with Wheat; indeed, the court noted, Pierce had only made social visits to the vessel. Unlike Hornor and Lippa, Pierce is not a surveyor but a yacht broker. Pierce did not conduct an inspection of the boat or have the boat surveyed, and much of his information about the vessel's condition was admittedly

---

[6]The district court did not make a specific factual finding regarding the cost of repairs (including alleged damage to certain antennas and laptop computers owned by Wheat International that were onboard the Marquessa). It noted, however, that "[e]ven under the [P]laintiffs' estimations, the [c]ourt could find the vessel to be a constructive total loss. Appellants' expert on value testified that the vessel was worth $900,000, while their estimates for repairs reach over $1.1 million." J.A. 410.

provided by Wheat. Significantly, in contrast to the other experts, Pierce's estimates were largely drawn from a listing service that provided asking price rather than sale price. In addition, Pierce only provided the sale price for one boat he considers a comparable, which notably is almost 10' longer than the Marquessa and a different make and model. By contrast, both Hornor and Lippa looked to sale prices of comparable vessels when conducting their market analyses.

b.

Based on these factual findings, the district court entered judgment for Appellants, finding that they were entitled to $440,000, the value of the vessel at the time of the allision. The United States moved to amend the judgment because the parties had previously stipulated that Wheat Maritime subrogated to its insurer its rights to recover $682,500 paid toward physical damage to the Marquessa. Should such damages be awarded, neither Wheat Maritime nor Wheat International could claim the right to recover the first $682,500 awarded.[7] The district court granted the motion, holding that in view of the parties' stipulation of subrogation, Appellants were not entitled to receive $440,000 from the United States. Appellants now appeal from the district court's amended judgment.

II.

Appellants present the following issues on appeal: whether the district court erred in applying the constructive loss doctrine to this case; whether the district court erred in finding that the Marquessa had a market value of $440,000 (specifically whether the district court erred in crediting Hornor's and Lippa's testimony regarding market value and erred in failing to consider other evidence of market value); whether appel-

---

[7]Appellants received $682,500 from their insurer for damage to the Marquessa. The United States settled with the Appellants' insurer in the same amount.

lant Wheat International was entitled to a separate judgment for damage alleged to certain equipment on board the Marquessa; and whether the district court correctly amended its initial judgment to account for Appellants' stipulation that they were not entitled to the first $682,500 in damages for the physical damage done to the Marquessa. We consider each contention in turn.

A.

We first consider whether the district court erred in applying the doctrine of constructive total loss. Appellants argue that the doctrine is inapplicable where it can be shown that no vessel could provide an adequate replacement. We review this legal question de novo. *See Garris v. Norfolk Shipbuilding & Drydock Corp.*, 210 F.3d 209, 211 (4th Cir. 2001).

"It is fundamental in the law of damages that the injured party is entitled to compensation for the loss sustained." *Std. Oil Co. v. Southern Pac. Co.*, 268 U.S. 146, 155 (1925). We have held that "restitutio in integrum"—that is, restoration of the injured party to the position it occupied before the wrong—is the "precept in fixing damages." *Hewlett v. Barge Bertie*, 418 F.2d 654, 657 (4th Cir. 1969). Accordingly, "where repairs are practicable[,] the general rule followed by the admiralty courts . . . is that the damages assessed against the respondent shall be sufficient to restore the injured vessel to the condition in which she was at the time the collision occurred." *Id.* (quoting *The Baltimore*, 75 U.S. (8 Wall) 377, 385 (1869)). In the event of a total loss, the injured party is restored to the position it occupied before the wrong if it receives the vessel's pre-casualty fair market value. *Std. Oil Co.*, 268 U.S. at 155; *Hewlett*, 418 F.2d at 657. Similarly, if the cost of repairing the vessel exceeds her pre-casualty fair market value, the limit of compensation is the vessel's fair market value at the time of the casualty. *Hewlett*, 418 F.2d at 657 (citing *O'Brien Bros. v. The Helen B. Moran*, 160 F.2d 502 (2d Cir. 1947)); *see also U.S. Fire Ins. Co. v. Allied Tow-*

*ing Corp.*, 966 F.2d 820, 825-28 (4th Cir. 1992) (reversing the district court's damages calculation without disturbing its finding that the vessel was a constructive total loss because the cost of repair exceeded the value of the vessel at the time of the collision).

This rule flows from the principle that by receiving the vessel's monetary equivalent in damages, the owner is put in as good of a position pecuniarily as he would have been in if his property had not been destroyed. *See Std. Oil Co.*, 268 U.S. at 155. Moreover, the rule limiting damages to market value in the event of constructive total loss is premised on the sound assumption that a shipowner of ordinary prudence would not go to the expense of repairing a vessel if the cost of repair would be greater than the fair market value of the vessel after repair. A plaintiff is therefore entitled to be made whole, but only in the least expensive way: market value or replacement cost, whichever is less.[8] *Cf. Maryland Cas. Co. v. Armco, Inc.*, 822 F.2d 1348, 1353 (4th Cir. 1987) (noting that the purpose of damages is to replace the loss in value with a sum of money and that it might very well cost far more to restore damaged property than it would to pay damages for its loss)(citing *Peevyhouse v. Garland Coal & Mining Co.*, 382 P.2d 109 (Okla. 1962)); *Fisher v. Qualico Contracting Corp.*, 779 N.E.2d 178, 181-82 (N.Y. 2002) (affirming New York's rule that as between market value and replacement cost, the plaintiff is entitled to the lesser of the two); Douglas Laycock, *Modern American Remedies* 26 (4th ed. 2010) (noting that New York's "lesser of two" rule is well-settled in most jurisdictions, although not entirely uncontroversial).

Appellants' argument regarding the uniqueness of the Mar-

---

[8]It bears note that under the rule Appellants seek, vessel owners would receive greater compensation if the vessel were capable of repair than if it were a total loss. Stated another way, tortfeasors would be worse off if they merely damaged, rather than destroyed, a vessel. Such a distorted set of results and incentives militates against Appellants' proposed rule.

quessa is not without some merit. We recognize that courts have awarded a vessel's replacement cost, even when it is greater than her purported market value, where the person who suffered the loss proved a unique use for the vessel that would not be recognized in her market price. *See King Fisher Marine Serv., Inc. v. NP Sunbonnet*, 724 F.2d 1181, 1185-87 (5th Cir. 1984) (upholding a replacement cost award where plaintiff had purchased a barge because of her unique capabilities and repurposed her as a drydock platform and the market did not value the barge's use as a drydock platform); Thomas J. Schoenbaum, *Admiralty & Maritime Law*, § 14-6, at 143 (5th ed. 2011) (observing that replacement cost may be determined to be a more accurate measure where the person who suffered the loss proved a unique use of the vessel). In those rare cases, the vessel effectively has no market value because of her unique use, and it may be appropriate to award her replacement cost in damages. *Cf. Allied Towing*, 966 F.2d at 826 (concluding that "[a] court may permissibly value a vessel for which a market value is not ascertainable by relying upon any number of methodologies, including the vessel's replacement cost depreciated").

Because we agree with the government that Appellants simply used the Marquessa as a yacht and did not prove that their use of the vessel was so idiosyncratic as to lack any market comparables, we hold that the Marquessa possessed no special qualities that filled legitimate commercial needs that would not be recognized in her market price.

We therefore affirm on these facts the longstanding rule that if the cost of repairing a vessel exceeds her pre-casualty fair market value, the limit of compensation is the vessel's fair market value at the time of collision.

## B.

We next consider whether the district court erred in finding that at the time of the allision, the Marquessa had a market

value of $440,000. Appellants raise two challenges in this regard. First, Appellants contend that the district court erred in crediting the testimony of Hornor and Lippa regarding market value over that of Pierce; with respect to Lippa, they also assert that the district court improperly admitted portions of his testimony. Second, they argue that the district court erred in failing to consider other evidence as to the Marquessa's value. We address each contention in turn.

This court reviews findings of fact following a bench trial in an admiralty case for clear error, construing the evidence in the light most favorable to the appellee. *Evergreen Int'l S.A. v. Norfolk Dredging Co.*, 531 F.3d 302, 308 (4th Cir. 2008). We review a mixed question of law and fact "by inspecting factual findings for clear error and examining de novo the legal conclusions derived from those facts." *Meson v. GATX Technology Servs. Corp.*, 507 F.3d 803, 806 (4th Cir. 2007). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed. *Evergreen*, 531 F.3d at 308. Where a district court's factual finding in a bench trial is based upon an assessment of witness credibility, such finding "is deserving of the highest degree of appellate deference." *Id.* We review a district court's decision to admit expert testimony for abuse of discretion. *See, e.g.*, *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 141-42 (1997); *Christopher Phelps & Assocs., LLC v. Galloway*, 492 F.3d 532, 542 (4th Cir. 2007).

As noted above, the measure of damages for a total loss (including a constructive total loss) is market value established by contemporaneous sales of like property in the ordinary course of business. *Std. Oil Co.*, 268 U.S. at 155; *Hewlett*, 418 F.2d at 658.

### 1.

Appellants argue that the trial court erred by crediting Hornor's and Lippa's expert testimony regarding the Marquessa's

market value. Appellants attack Hornor's credibility in two principal ways. First, they argue that at the time he prepared his expert report and stated his opinion on market value, Hornor had reviewed no documents or other evidence related to the purchase of the Marquessa, surveys at the time of purchase, the modifications made to the Marquessa, or an interrogatory response listing all of her custom modifications. As the district court noted, however, Hornor had inspected the vessel extensively and could assess her value and condition. Moreover, Hornor ultimately reviewed the relevant evidence and testified that none of this information changed his opinion of the value of the Marquessa. The fact that he had not done so earlier is therefore of little import.

Second, Appellants contend that the seven other extended Bertrams used by Hornor for comparison were not comparable to the Marquessa because they were not identical in length; did not have the same number of staterooms, heads, and crew quarters; and did not have a 60' flybridge. The district court, however, reasonably credited Hornor's expert testimony that the modifications to the Marquessa not only did not improve her value, but in some instances decreased her stability.

Appellants also contend that the district court erred in admitting Lippa's expert testimony on pre-incident market value of the vessel and in significantly relying upon that evidence in its decision. While the former assertion presents a somewhat close question, the latter is belied by the record.

As noted above, Appellants did object to the government's questioning Lippa regarding "the Marquessa's preloss actual cash value" as "exceed[ing] the scope of his expertise in this case," and the district court, somewhat puzzlingly, ruled that it would allow the testimony because "he's talking about the cost of repair and what needs to be repaired." J.A. 182-83. In fact, Lippa went on to testify regarding the Marquessa's fair market value based upon the market approach, which involves

looking at sales of comparable vessels. Thus, the district court's expressed rationale for allowing Lippa's expert testimony somewhat misses the mark. However, as the government points out, Appellants offer no serious contention that Lippa—an accredited marine surveyor with nine years' experience with recreational vessels—is unqualified to value the Marquessa. In the absence of any evidence that Lippa in fact lacked the requisite expertise, the district court did not abuse its discretion in admitting Lippa's expert testimony.

Moreover, the record clearly indicates that the district court did not significantly rely on Lippa's expert testimony. To the contrary, it only briefly addressed Lippa's conclusion regarding the value of the vessel, instead focusing the bulk of its discussion on Hornor's analysis.

In sum, Appellants' arguments fall short of establishing that the district court, having considered the expert testimony and arguments presented, erred in choosing to credit Hornor's (and to some extent Lippa's) conclusions regarding the Marquessa's value. The district court also had ample reason to doubt Pierce's credibility for the reasons we have noted: he was not an expert surveyor; his methodology lacked reliability (he conducted no inspections or surveys, based his valuation on the asking—not sales—prices of vessels, could identify only one purportedly comparable vessel, and admitted that his valuation process was not very scientific); and he was likely influenced by his longstanding personal relationship with Wheat. On this record, we see no reason to disturb the district court's well-supported credibility determination—even were it not deserving of our highest deference on appeal.

2.

Next, we address Appellants' contention that the district court erred by failing to consider other evidence of the Marquessa's value. Specifically, Appellants assert that insurance

valuation and the fact of the Marquessa's unique suitability to them were relevant considerations.

"Where there is no market value, such as is established by contemporaneous sales of like property in the way of ordinary business, as in the case of merchandise bought and sold in the market, other evidence is resorted to." *Std. Oil Co.*, 268 U.S. at 155; *Barton v. Borit*, 316 F.2d 550, 553 (3d Cir. 1963) (same); *Carl Sawyer, Inc. v. Poor*, 180 F.2d 962, 963 (5th Cir. 1950)(same). As noted above, we have concluded that "[a] court may permissibly value a vessel for which a market value is not ascertainable by relying upon any number of methodologies, including . . . expert opinion regarding the value of the vessel . . . and the amount for which the vessel was insured." *Allied Towing Corp.*, 966 F.2d at 826 (citing *Standard Oil*, 268 U.S. at 156, and *Sawyer*, 180 F.2d at 963). Appellants are therefore correct to note that other evidence may be probative of value in some circumstances. Here, however, the district court established the Marquessa's market value based on expert opinion regarding contemporaneous sales, and therefore did not need to consider any other evidence as to her value. Appellants' argument that the district court erred in failing to consider the Marquessa's idiosyncratic value also falters for the same reason. We have held that "[t]he special value to the owner is a consideration of substance," but only where the vessel has no ascertainable market value. *Hewlett*, 418 F.2d at 658. Here, the district court reasonably credited expert testimony establishing a market value for the Marquessa.

## C.

Next, we consider whether appellant Wheat International was entitled to a separate judgment for damage alleged to antennas and computers it owned that were on board the Marquessa. Appellants argue that these items are not inherently part of the vessel and have nothing to do with repair of the vessel, and thus appellant Wheat International is entitled to

damages for them whether or not the Marquessa is considered a constructive total loss.

A plaintiff has the burden to prove both the fact of damage and the extent of that damage with reasonable certainty. *See Yarmouth Sea Products Ltd. v. Scully*, 131 F.3d 389, 395-97 (4th Cir. 1997) (applying the reasonable certainty standard to lost profit damages); *Turecamo Mar., Inc. v. Weeks Dredge No. 516*, 872 F. Supp. 1215, 1233 (S.D.N.Y. 1994) (applying the reasonable certainty standard to recovery for the reasonable cost of repairs).

We conclude that there is insufficient basis in the record for determining the fact or extent of the alleged damage to the antennas and computers. Notably, Appellants do not dispute that they failed to visually inspect the antennas for damage and did no testing. Likewise, with regard to the computers, Appellants obtained an estimate to replace them, but apparently without first determining whether they were repairable. On this record, the fact of loss is speculative, and there is no certainty as to the extent of any damage.[9]

D.

Finally, we consider whether the district court erred in amending its initial judgment to account for Appellants' stipulation that they were not entitled to the first $682,500 in damages for the physical damage done to the Marquessa. This court recognizes three grounds for amending an earlier judgment: (1) an intervening change in controlling law, (2) the emergence of evidence not previously available, and (3) the correction of a clear error of law or the prevention of manifest injustice. *Pacific Ins. Co. v. Am. Nat'l Fire Ins. Co.*, 148 F.3d

---

[9]Because we conclude that the Appellants did not meet their burden of proof with respect to the fact and extent of damage, we need not resolve whether Wheat International's equipment formed an inherent part of the Marquessa.

396, 403 (4th Cir. 1998). The district court found that amendment was appropriate to avoid the manifest injustice of having Appellants recover a reward of $440,000 to which they are not entitled.

Appellants argue that awarding them damages would not be a manifest injustice because the damages award was for the value of the vessel, rather than physical damage done to the vessel. This is pure sophistry. As the government points out, under either measure of damage, reasonable repair cost or market value, the government would be compensating Appellants for the physical damage it did to the Marquessa. Moreover, we are persuaded by the government's argument that the amended judgment comports with the interests of justice, as any further recovery for Appellants would constitute a double recovery for them (because they already received $682,500 from their insurer for damage to the Marquessa), and a double payment by the United States (which states that it settled with the Appellants' insurer in the same amount, based, in part, upon the stipulations by the Appellants that they were not entitled to that sum).

### III.

For the foregoing reasons, we affirm the judgment of the district court.

*AFFIRMED*