**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 14-1245**

RG STEEL SPARROWS POINT, LLC, f/k/a Severstal Sparrows
Point, LLC,

                Plaintiff – Appellee,

     and

SEVERSTAL SPARROWS POINT, LLC,

                Plaintiff,

     v.

KINDER MORGAN BULK TERMINALS, INC., d/b/a Kinder Morgan
Chesapeake Bulk Stevedores,

                Defendant – Appellant.

Appeal from the United States District Court for the District of
Maryland, at Baltimore.  William M. Nickerson, Senior District
Judge.  (1:09-cv-01668-WMN)

Argued:  January 28, 2015        Decided:  April 28, 2015

Before TRAXLER, Chief Judge, and DIAZ and THACKER, Circuit
Judges.

Affirmed by unpublished per curiam opinion.  Judge Diaz wrote a
separate concurring opinion.

**ARGUED:** Thomas M. Wolf, LECLAIRRYAN, PC, Richmond, Virginia, for
Appellant.  Denise A. Lazar, BARNES & THORNBURG, LLP, Chicago,

Illinois, for Appellee. **ON BRIEF:** Joseph M. Rainsbury, LECLAIRRYAN, PC, Roanoke, Virginia, for Appellant. L. Rachel Lerman, BARNES & THORNBURG, LLP, Los Angeles, California; Linda S. Woolf, GOODELL DEVRIES LEECH & DANN, LLP, Baltimore, Maryland, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

This case arose in the aftermath of the catastrophic collapse of a bridge crane used by Kinder Morgan Bulk Terminals Inc. ("Appellant") to unload coke used to fuel a steel mill located near Baltimore, Maryland. Ownership of the steel mill and the bridge crane changed hands several times in recent history. The appellee in this case, RG Steel Sparrows Point LLC ("RG Steel"),[1] acquired the company that owned the steel mill and the bridge crane through a stock purchase on March 31, 2011. Following the bridge crane collapse, Appellee sued Appellant for negligence. Appellee also claimed its right to indemnification for losses pursuant to a lease and service contract governing Appellant's use of the bridge crane ("Lease").

Appellant maintained that it was not negligent and that it had no duty to indemnify Appellee. It argued that the limitation-of-liability provision of a purchase order that was in force at the time of the crane accident applied instead of the Lease's indemnity clause. After a bench trial, the district court entered judgment in Appellee's favor. The district court found that the parties renewed the Lease by an implied-in-fact contract and concluded that the purchase order did not supersede

---

[1] For ease of reference, we refer to RG Steel and the companies that previously owned the steel mill and the bridge crane collectively as "Appellee."

the Lease's indemnity clause under Maryland law because the Lease defined the parties' relationship with respect to the crane and the purchase order governed a different subject matter. The district court held Appellant liable for over $15.5 million, awarding compensatory damages for destruction of Appellee's property and consequential damages for Appellee's resulting business losses.

In the instant action, Appellant does not challenge the district court's award of compensatory damages, nor does it dispute the court's finding that the parties were generally operating under an implied-in-fact renewal of the Lease. Instead, it argues the district court erred in concluding Appellant was liable for consequential damages pursuant to the Lease's indemnity clause. Appellant claims the district court should have applied the limitation-of-liability provision of a purchase order agreement that was in force at the time the crane collapsed -- a provision that Appellant contends superseded the Lease's indemnity clause and foreclosed any consequential damages award. In the alternative, Appellant avers that, even if the district court was correct to hold Appellant to the Lease's indemnity clause, the district court erred when it qualified Appellee's damages expert to testify and relied on the expert's calculation in ordering its award for consequential damages.

4

We affirm the district court's rulings in their entirety, albeit on different grounds. See Hutto v. S.C. Ret. Sys., 773 F.3d 536, 549-50 (4th Cir. 2014) (affirming "for a reason supported by the record but not relied on by the district court"). Appellant is liable for consequential damages even under the express terms of the purchase order it wishes us to apply. Furthermore, the district court did not abuse its discretion by permitting Appellee's damages expert to testify, and it did not clearly err in determining the amount of Appellee's damages award.

I.

A.

The Lease at issue originated in 1992, although both parties acquired their interests in this contractual relationship at a much later date. Under the Lease, Appellee leased the bridge crane to companies providing stevedoring[2] services for the steel mill's "A Yard." The stevedores undertook to keep the bridge crane in good repair and to maintain an insurance policy on it.

The Lease contained an indemnity provision, which read as follows:

---

[2] Stevedores load and unload cargo from ships. See Black's Law Dictionary 1549 (9th ed. 2009).

> [The stevedores] shall . . . indemnify and save harmless [Appellee] from and against <u>all loss or liability for or on account of any injury</u> (including death) or damages received or sustained by any person or persons (including [Appellee] and any employee, agent, or invitee thereof) <u>by reason of any act or omission, whether negligent or otherwise, on the part of [the stevedores]</u> or any employee, agent, subcontractor, representative, invitee, or business visitor of [the stevedores], including any breach or alleged breach of any statutory duty which is to be performed by [the stevedores] hereunder but which is or may be the duty of [Appellee] under applicable provisions of law.

J.A. 692-93 (emphasis supplied).[3] The stevedores also "assume[d] the entire risk of loss, theft, or destruction of the [bridge crane] resulting from any cause whatsoever." Id. at 690. During the life of the Lease, Appellee entered into purchase order contracts with the stevedores to unload coke-carrying vessels in the port.

In December 2002, Appellant, a company that provides stevedoring services, purchased its predecessor's rights and liabilities under the Lease. Although the Lease was set to terminate at the end of July 2003, Appellant and Appellee entered into a separate short-term interim agreement to extend the Lease. Initially, this interim agreement was set to expire

---

[3] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

when Appellee and Appellant executed a long-term agreement governing the use of the bridge crane or on December 31, 2003, whichever occurred sooner. However, Appellant and Appellee extended the interim period several times. When they ultimately were unable to reach a long-term agreement, the Lease finally expired at the end of 2005.

Although Appellant never expressly renewed the Lease after 2005, it continued to conduct business with Appellee "largely in the same manner as [it] had under the Lease." J.A. 600. For example, Appellant "repeatedly referenced the Lease" in its communications with Appellee and it "maintain[ed] the [b]ridge [c]rane at its own expense," in accord with the terms of the Lease. Id. at 600–01. Appellant also continued to use the bridge crane to unload ships pursuant to various purchase order contracts.

B.

1.

On June 4, 2008, the National Weather Service issued a tornado watch for the central Maryland area. By 3:35 p.m. that day, wind speeds measured over 90 miles per hour. Despite its own procedures and federal regulations which require preventative measures during high winds, Appellant did not deploy hurricane tie downs, and the bridge crane's automatic

rail clamps had been removed at some point in the mid-1990s.[4] Without the benefit of these safety measures, the wind toppled one the bridge crane's A-frame legs, and the crane fell.

2.

As an immediate result of the crane collapse, Appellee closed the A Yard and paid for emergency repairs to its facilities. Appellee also suffered other consequential losses arising from delays and increased handling charges attributable to the loss of the crane. Without a crane to unload coke for the steel mill's blast furnace, cargo ships carrying coke were required to unload their cargo at another terminal farther away from the blast furnace: the New Ore Pier. Because the New Ore Pier already serviced a number of ships on a regular basis, it struggled to accommodate the additional traffic. To make matters worse, in order to keep the blast furnace lit, Appellee was required to schedule the coke-carrying ships before other non-coke-carrying vessels also waiting to unload at the New Ore Pier. This rescheduling, coupled with port congestion caused by

---

[4] Appellant does not dispute the fact that its own standard operating procedures "instructed [Appellant] to employ hurricane tie downs [on the crane to secure it] in the event of strong winds." J.A. 603. Additionally, Occupational Safety and Health Administration regulations require bridge cranes to be equipped with automatic rail clamps "that prevent cranes from moving during high wind events." Id. at 614-15; see also 29 C.F.R. § 1910.179(b)(4).

8

re-routing the coke-carrying ship traffic to the New Ore Pier, resulted in transit delays. As a result, Appellee paid demurrage[5] fees pursuant to its contracts with these ships.

When the A Yard reopened in the latter half of 2008, Appellant used floating cranes to unload coke ships and it placed the coke in piles near the mill. Because the floating cranes unloaded cargo at a rate significantly slower than the bridge crane, Appellee faced the possibility of future demurrage fees. To mitigate its losses, Appellee renegotiated its contracts with cargo ships and agreed to pay increased fees to offset the delays. Appellee also needed to restore and modify a conveyor in order to move the coke from piles in the A Yard to the blast furnace. Mill operations did not normalize until approximately three years later, in August 2011, when Appellant purchased and installed its own crane at the A Yard.

3.

At the time of the bridge crane's collapse on June 4, 2008, Appellee and Appellant were bound by a February 21, 2008 purchase order ("Purchase Order") that required Appellee to "unload[] up to 500,000 [tons] of coke from ships with bridge

_____

[5] In maritime law, the term "demurrage" applies to "[l]iquidated damages owned by a charterer to a shipowner for the charterer's failure to load or unload cargo by the agreed time." Black's Law Dictionary 498 (9th ed. 2009).

crane [sic]." J.A. 992. The Purchase Order also incorporated the terms of another document entitled "AMUSA-100." See id.

The AMUSA-100 defined the parties' rights and liabilities with respect to the Purchase Order. Section 7.6 of the AMUSA-100 contained the following limitation-of-liability provision:

> In no event shall either party be liable to the other under this order for consequential, indirect or special damages, including without limitation lost profits, revenues, production or business . . . .

J.A. at 1000. However, per section 1.4 of the AMUSA-100, other "specific terms agreed in writing" that "contradict[]" "corresponding" terms in the AMUSA-100 "shall prevail." Id. at 997.

C.

Appellee filed suit against Appellant in the District Court for the District of Maryland on June 24, 2009. In its amended complaint, Appellee claimed that Appellant was negligent for failing to secure the bridge crane from the impending storm, and that it was liable in contract for breaching the Lease by refusing to indemnify Appellee for losses arising from the crane collapse.

The parties fought this dispute at a seven-day bench trial in November and December 2013. At trial, Appellee offered the testimony of its Corporate Controller, Jeffrey Gennuso, who

10

testified about the general effect of the crane collapse on steel mill operations and Appellee's contractual relationships. Jeffrey Cohen, an economist, provided expert testimony about the calculation of consequential damages Appellee suffered.

The district court reached a verdict in favor of Appellee on both its negligence and breach of contract claims. The district court awarded a total of $15,555,884[6] to Appellee, which covered the following categories of damages:

- compensatory damages for loss of the bridge crane;

- compensatory damages for emergency repairs to Appellee's facilities and for restoration and modification of the conveyor, all of which Appellant conceded at trial; and

- consequential damages for demurrage fees, changes in commercial terms, and increased handling costs.[7]

Appellant does not appeal any part of the district court's award of compensatory damages. Instead, it argues only

---

[6] The court's original damages award was approximately $13 million, but it increased this amount after correcting a clerical error. This adjustment only affected the district court's calculation of Appellee's compensatory damages for loss of the bridge crane. See Order Granting Motion to Amend/Correct Clerical Error, Severstal Sparrows Point, LLC v. Kinder Morgan Bulk Terminals, Inc., No. 1:09-cv-01668 (D. Md. Jun. 24, 2009; filed May 6, 2014), ECF No. 183.

[7] At trial, Appellant conceded it was liable for damages due to Appellee's increased handling costs.

11

that the district court erred in ordering consequential damages

for demurrage fees and changes in commercial terms.

## II.

### A.

#### Contract Interpretation

##### 1.

The threshold question is whether the district court

correctly concluded that Appellant should be required to

indemnify Appellee, or whether an agreement between the parties

prohibits such an award.

Interpretation of a contract renders a legal

conclusion, and we review the district court's legal conclusions

de novo. See FTC v. Ross, 743 F.3d 886, 894 (4th Cir. 2014);

Perini/Tompkins Joint Venture v. Ace Am. Ins. Co., 738 F.3d 95,

101 (4th Cir. 2013). We apply substantive state law to resolve

appeals of district court rulings that rest on state law,

including those involving interpretation of private contracts.

See James v. Circuit City Stores, Inc., 370 F.3d 417, 421-22

(4th Cir. 2004).

The district court found that the parties renewed the

Lease by an implied-in-fact agreement and therefore "the

Lease . . . [and] its terms and conditions were in effect" at

the time of the crane collapse. J.A. 612. In essence, the

district court found that this implied-in-fact contract was

12

nothing more than an agreement to renew the Lease and to amend its duration term. But Appellant argued that, even if the Lease was renewed by an implied-in-fact contract, Maryland law required that the later-in-time written Purchase Order took precedence over the Lease. Cf. Cnty. Comm'rs of Caroline Cnty. v. J. Roland Dashiell & Sons Inc., 747 A.2d 600, 607 (Md. 2000) (holding that a contract implied in law cannot supplant an express contract governing the same subject). It argued that under the AMUSA-100, which was incorporated into the Purchase Order, Appellant was not required to indemnify Appellee. The district court rejected Appellant's argument, concluding that the Purchase did not govern the same subject and that the Lease's indemnity clause therefore applied.

Appellant does not appeal the district court's finding that it renewed the Lease through an implied-in-fact contract. Nor does it dispute the district court's conclusion that it would be liable for consequential damages if the Lease's indemnity provision applied. Instead, Appellant renews its argument that the Lease did not apply and that Appellant should prevail by virtue of the AMUSA-100. We disagree, and conclude that Appellant would be liable pursuant to the AMUSA-100's plain terms in any event.

Appellant argues that the district court erred because it permitted an implied-in-fact agreement to renew the Lease to supersede an express contract on the same subject matter -- the Purchase Order -- in contravention of Maryland law. Although the Lease and the Purchase Order address the same subject matter, Appellant's argument is nonetheless flawed. For one, the Maryland courts have not adopted the rule Appellant pushes; they have only held that a contract implied in law cannot supplant an express contract governing the same subject. See Cnty. Comm'rs of Caroline Cnty., 747 A.2d at 607. And even assuming Appellant's interpretation of Maryland law is correct, the AMUSA-100's plain text and Appellant's implied-in-fact agreement to renew the Lease compel us to reach the same result as the district court: Appellant is liable to indemnify Appellee for consequential damages.

3.

When a contract is unambiguous, Maryland courts give full effect to the plain meaning of its terms. See Wells v. Chevy Chase Bank, F.S.B., 768 A.2d 620, 630 (Md. 2001). Per section 1.4 of the AMUSA-100, "specific terms agreed in writing" by the parties that contradict "corresponding . . . provisions" of the AMUSA-100 "shall prevail." J.A. 997. The effect of this safety valve provision is unambiguous: the AMUSA-100 bows to

similar, yet contradicting, terms of a written agreement between the parties.

There is no question that the Lease's indemnity clause is a "specific term[] in writing" that "correspond[s]" to the AMUSA-100's limitation-of-liability provision. J.A. 997. Appellant instead argues that the implied-in-fact renewal of the Lease is not a term agreed to in writing and section 1.4 "does not prevent the Purchase Order from trumping any prior implied-in-fact agreement." Appellant's Reply Br. 13. Although an implied-in-fact agreement is necessarily not in writing, the implied-in-fact agreement in this case only amended the Lease term and does not "contradict[]" the limitation-of-liability provision of the AMUSA-100. J.A. 997. The AMUSA-100 has no "corresponding" temporal limitation. The Lease's indemnity clause, on the other hand, is an agreement in writing that conflicts with the AMUSA-100's limitation-of-liability provision. Therefore, the AMUSA-100 unambiguously requires that Appellant be held to the Lease. The Lease states that the crane operator "assumes the entire risk of loss of the . . . [b]ridge [c]rane resulting from any cause whatsoever." Id. at 690.

Therefore, we affirm the district court's conclusion that Appellant was required to indemnify Appellee for consequential damages it incurred as a result of the crane's collapse.

15

B.

Damages

We now turn to whether the district court's awards for demurrage and changes in commercial terms have evidentiary support. The evidence upon which the district court principally relied when ordering these awards was the calculation provided by Cohen; Appellant asserts Cohen was unqualified to testify as an expert on such matters. Accordingly, Appellant claims the district court lacked sufficient evidence to order damages for demurrage and changes in commercial terms.

1.

Admissibility of Expert Testimony

A district court's decision to qualify and admit the testimony of an expert witness is one that we review for abuse of discretion. "A court abuses its discretion if its decision is guided by erroneous legal principles or rests upon a clearly erroneous factual finding." United States v. Garcia, 752 F.3d 382, 390 (4th Cir. 2014) (internal quotation marks omitted).

Appellant claims that the district court abused its discretion by qualifying Cohen as an expert to testify about Appellee's damages for demurrage and changes in commercial terms. Appellant concentrates on Cohen's admitted lack of experience with maritime contracts.

16

Rule 702 of the Federal Rules of Evidence permits expert witnesses to testify if their "scientific, technical, or other special knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," such as the amount of damages due. Fed. R. Evid. 702. The question of whether a witness is qualified to testify is context-driven and "can only be determined by the nature of the opinion he offers." Gladhill v. Gen. Motors Corp., 743 F.2d 1049, 1052 (4th Cir. 1984). Because our general preference is to admit evidence that will aid the trier of fact, the expert need only have "sufficient specialized knowledge to assist jurors in deciding the particular issues in the case." Belk, Inc. v. Meyer Corp., U.S., 679 F.3d 146, 162 (4th Cir. 2012) (internal quotation marks omitted); see Westberry v. Gislaved Gummi AB, 178 F.3d 257, 261 (4th Cir. 1999) ("Rule 702 was intended to liberalize the introduction of relevant expert evidence."); Thomas J. Kline, Inc. v. Lorillard, Inc., 878 F.2d 791, 799 (4th Cir. 1989) ("Generally, the test for exclusion is a strict one, and the purported expert must have neither satisfactory knowledge, skill, experience, training nor education on the issue for which the opinion is offered."). In order to offer an opinion, "one . . . need not be precisely informed about all details of the issues raised" or even have prior experience with the particular subject the testimony concerns. Lorillard, 878

17

F.3d at 799; see Fed. R. Evid. 703 (providing that "[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of [at trial] or personally observed").

In this case, Appellant "reads this [qualification] requirement far too narrowly." Belk, 679 F.3d at 162. Although Cohen had no prior experience with maritime contracts, his opinion did not call for such expertise. Rather, his function was to calculate Appellee's damages.[8] Cohen has an MBA in economics. He created mathematical formulas for this case after reviewing information that he obtained before trial by personally interviewing Appellee's employees and reading their deposition testimony. Cohen then formed his opinion on the extent of Appellee's losses by applying his formulas.

The fact that Cohen had not previously analyzed issues that are specific to maritime contracts does not mean the district court abused its discretion in admitting Cohen's expert testimony. Here, similar to the appellant in Belk, Inc. v. Meyer Corp., U.S., Appellant "provide[d] no support for its argument" that the economics of maritime contracts and steel mill operations "is so sui generis such that an expert's lack of

_____

[8] Cohen testified at trial as to his limited role: "I mean, as an economist, looking at the data, the best I can do is make a comparison between two conditions and the result of that analysis attributes only the incremental effect to that condition." J.A. 325.

18

expertise in . . . these specific [areas] necessarily disqualifies him from giving an expert opinion." Belk, 679 F.3d at 162. Background issues that required special knowledge of steel mills and maritime commerce were addressed by other witnesses at trial, including Gennuso.[9] Although Cohen relied on information provided by other witnesses at trial to devise his formula, the Federal Rules of Evidence specifically authorized him to do so. See Fed. R. Evid. 703.

Thus, we conclude that the district court did not abuse its discretion by permitting Cohen to offer expert testimony as to his calculation of Appellee's damages for demurrage and changes in commercial terms.

---

[9] Gennuso's testimony drew a relationship between lower discharge rates and the higher prices Appellee paid on coke contracts after the accident:

> So when we entered into new coke contracts, that portion that determined the delivery cost of the material required a discharge rate in order for them to properly calculate the freight.
> The discharge rate of 5,000 tons a day [using the floating cranes, which is approximately 3,000 tons per day slower than rates achieved using the bridge crane] was provided to us from Kinder Morgan. . . .
> . . . So we used the 5,000 tons per day [discharge rate in the renegotiated contracts], which again was provided by Kinder Morgan . . . .

J.A. 485.

2.

Sufficiency of Evidence for Damages Award

a.

When considering an appeal after a bench trial, we review the district court's factual findings for clear error and its legal conclusions de novo.  See Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc., 618 F.3d 417, 427 (4th Cir. 2010).  "A court's calculation of damages is a finding of fact and is therefore reviewable only for clear error . . . ."  Id. (internal quotation marks omitted).  Furthermore, when "a district court's factual findings turn on . . . the weighing of conflicting evidence during a bench trial, such findings are entitled to even greater deference."  Ross, 743 F.3d at 894 (internal quotation marks omitted); see also F.C. Wheat Mar. Corp. v. United States, 663 F.3d 714, 723 (4th Cir. 2011).

A court sitting in diversity must apply state law governing the threshold of proof necessary for a damages award and the amount of that award.  See Defender Indus., Inc. v. Nw. Mut. Life Ins. Co., 938 F.2d 502, 504-05 (4th Cir. 1991) (en banc).  According to Maryland law, "if the fact of damage is proven with certainty, the extent of amount thereof may be left to reasonable inference."  David Sloane, Inc. v. Stanley G. House & Assocs. Inc., 532 A.2d 694, 696 (Md. 1987) (internal quotation marks omitted).

20

b.

Our task is to determine whether the district court had sufficient evidence to conclude that Appellee proved, to a reasonable certainty, that it suffered damages for demurrage and change in commercial conditions. We must also decide if the amount the district court awarded was supported by a reasonable inference from the record.

During trial, Cohen presented his calculation of damages and concluded that Appellant was liable for approximately $2.7 million in demurrage fees and about $1.5 million in damages for changes in commercial terms. The district court agreed with Cohen on his demurrage calculations and awarded damages to Appellee accordingly. However, the district court disagreed, in part, with Cohen's calculation of Appellee's damages for changes in commercial terms. Therefore, the court awarded $1.06 million for these damages according to its own calculation.

Appellant claims the district court clearly erred in ordering damages awards for demurrage and changes in commercial terms. Regarding demurrage, Appellant concedes that Appellee suffered demurrage damages, but it disagrees with Cohen's

21

conclusions regarding the amount of such damages.[10]  Relating to changes in commercial terms, Appellant argues that the evidence failed to establish the extent of Appellee's losses to a reasonable certainty, and thus no damages should have been awarded in this category.

i.

Demurrage

Because Appellant only challenges the amount of the district court's award for demurrage, our inquiry focuses on whether the district court had substantial evidence to find that Cohen's demurrage calculation -- which the district court accepted -- was a reasonable inference from the record.  See Universal Furniture Int'l, Inc., 618 F.3d at 427; David Sloane, Inc., 532 A.2d at 696.  Appellant has failed to demonstrate that the district court's award for demurrage was not supported by reasonable inferences from the record.

Cohen's $2.7 million figure represented the amount in demurrage fees that Appellee paid to ships bringing materials to the steel mill as a result of the crane collapse, regardless of whether their cargo was coke.  To arrive at this number, Cohen found a "baseline" demurrage figure by averaging the amounts of

_____

[10]  Appellant concedes it is liable for only approximately $400,000 in demurrage damages, as opposed to the $2.7 million the district court awarded.

22

demurrage Appellee paid, per ton of cargo, for several months before the crane collapse. To determine the incremental amount Appellee paid in demurrage due to the accident, Cohen then considered the difference between the baseline figure and the average demurrage amount that Appellee paid over the two months following the accident.

Cohen asked Appellee's accounting personnel if any factors other than the crane collapse (e.g., changes in labor relations, commercial terms, prices, interest rates or inflationary components) could have caused the pronounced increase in its payment of demurrage fees. After reviewing the evidence and discussing the subject with Appellee's accountants, Cohen concluded that these other factors were not responsible for the increase in demurrage. He "was satisfied that one could safely attribute the [incremental demurrage] to the bridge collapse." J.A. 327. As the district court noted, "no . . . [other] data quantifying the [demurrage] loss directly attributable to the [b]ridge [c]rane [loss] was available." Id. at 627-28. The district court also had access to Gennuso's testimony that one of Appellee's employees worked with a member of Appellant's staff to "determine[] that [the increased] demurrage charges were directly a result of not being able to unload those ships at the A Pier." Id. at 217.

23

Nonetheless, Appellant assails Cohen's methodology for failing "to account for factors that could have affected his demurrage computation" and faults him for not investigating other causes of the incremental demurrage unrelated to the bridge crane accident, such as "problems with shore-side equipment, delays in tugs, problems with the ships, labor shortages, scheduling issues, etc." Appellant's Br. 55-56, 58. Yet Appellant offered no evidence to support its speculative claim that other potential factors that "could have significantly affected the amount of demurrage charges" actually had such an effect. Id. at 56.

In light of the considerable deference we afford to district court findings during bench trials, the record's surplus of support for the court's factual findings, and the wholly speculative nature of Appellant's argument, we conclude the district court's damages award for demurrage was a reasonable inference from the record.

ii.

Changes in Commercial Terms

After losing the bridge crane, Appellee renegotiated several of its contracts with coke-carrying vessels to account for the increased unload time and to avoid further demurrage. Gennuso testified that unloading delays increased transportation costs and, in turn, drove up the price Appellee paid for coke.

24

Cohen relied on this assumption to calculate an approximate damages amount for changes in commercial terms.

The district court did not take issue with Cohen's method, but it found that his calculation of the discharge rate in the post-collapse period was not entirely reliable. It concluded that Cohen's analysis failed to recognize that Appellant built a new crane in the A Yard in the second half of 2011, which dramatically increased discharge rates above those measured soon after the bridge crane collapsed. Accordingly, the district court awarded Appellee approximately $1.06 million for changes in commercial terms, which was substantially less than the approximately $1.5 million Appellee sought.

But Appellant argues that the district court should not have awarded damages for changes in commercial terms at all. In this regard, Appellant argues that the district court committed three errors in relying on Cohen's calculation of damages for changes in commercial terms: (1) Cohen only reviewed two shipping contracts in assessing the incremental discharge rate, which was an unreliably small sample size; (2) Cohen did not examine certain other potential causes for the change in contract terms, such as market fluctuations in the price of coke and Appellee's credit history; and (3) Cohen lacked a basis to assume a positive correlation between a decreased discharge rate and the price of coke. Appellant claims that these alleged

deficiencies rendered Cohen's calculation of damages unreasonably uncertain; therefore, the district court lacked sufficient evidence to conclude Appellee proved damages for changes in commercial terms. Each of these arguments lacks merit.

First, Appellant's attack on Cohen's methodology -- that it was fatally uncertain because it relied on an impermissibly small sample size for calculating the incremental discharge rate -- is plainly inconsistent with the evidence. Cohen viewed the two charter contracts merely to confirm that the pre- and post-accident discharge rates were accurate. As the district court noted, "Mr. Cohen testified that he did not rely on the contracts to glean the prices charged for coke, but instead sought verification of the discharge rates." J.A. 633. In any event, as we discussed with respect to the demurrage award, Cohen bolstered his conclusion by ruling out other causes for the delays that precipitated Appellee's renegotiation of the coke shipping contracts.

We likewise reject Appellant's two remaining arguments because Appellant failed to support these challenges with evidence. The district court's decision to credit Cohen's testimony was not clearly erroneous. No evidence suggests the district court's conclusion was not a "legally justifiable inference" from Cohen's testimony and the entirety of the

26

record. <u>Miller v. Mercy Hosp., Inc.</u>, 720 F.2d 356, 365 (4th Cir. 1983).

Appellant offered no evidence indicating that the possible alternative causes actually impacted Cohen's calculations. In fact, Appellant argued to the district court "that coke prices did not appreciably change from prices before the [b]ridge [c]rane collapse." J.A. 632. Furthermore, a district court's decision on how much weight to give testimony at a bench trial is one that we afford great deference. <u>See Ross</u>, 743 F.3d at 894. This principle applies to the district court's determination of whether Cohen sufficiently ruled out possible alternative causes for the increase in the contract prices Appellee paid for coke after the accident. <u>See Westberry</u>, 178 F.3d at 265 (providing that, unless a plaintiff's expert provides "no explanation" for why a defendant's suggested alternative causes are not plausible, these alternative causes "affect the weight that the jury should give the expert's testimony and not the admissibility of that testimony"). Without question, Gennuso logically linked the crane accident to actual changes in the contract price for coke. Here, whether Cohen sufficiently ruled out other causes is only a question of how much weight to give Cohen's opinion, and so we defer to the district court's conclusion.

27

Further, although Appellant argues Cohen improperly assumed a positive correlation between decreased discharge rates and the price of coke, Appellant again failed to point to any evidence in the record showing that the district court's decision to credit this assumption was clear error. Cohen's reasoning that discharge rates affect transportation costs, which then impact the cost of coke, was built on Gennuso's testimony that Appellee renegotiated coke shipping contracts at a higher rate to account for slower discharge rates caused by the crane collapse.

Mindful that district court findings in a bench trial should be given the "highest degree of appellate deference," we find no reason to upset the district court's determination. F.C. Wheat Mar. Corp., 663 F.3d at 723 (internal quotation marks omitted). The district court had a sufficient basis to conclude that Cohen proved Appellee's damages for changes in commercial terms to a reasonable certainty.

III.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.

28

DIAZ, Circuit Judge, concurring:

Although I share the majority's view of the outcome of this case, I diverge slightly in my understanding of the nature of the relationship between the parties after the expiration of the Interim Agreement in 2005. I would find that Kinder Morgan was bound by the Lease terms as a holdover tenant, and that the later purchase orders do not supersede the Lease terms in this case because they cover a different subject matter.

The record before the court does not support the conclusion that Kinder Morgan objectively intended to be bound by the terms of the 1992 Lease after the expiration of the final Interim Agreement in 2005. To the contrary, the undisputed evidence suggests that Kinder Morgan specifically did not wish to be bound by the original lease terms because it wanted to negotiate a new long-term agreement in order to invest in capital improvements to the "A" Pier. In fact, when RG Steel's predecessor proposed a new contract that would have extended the interim period through March 2006, Kinder Morgan refused to sign it. Kinder Morgan's occasional post-2005 references to the expired Lease do not alter this conclusion, and indeed, some of the references support Kinder Morgan's assertion that it no longer considered itself bound by the Lease. See, e.g., J.A. 888 (in which Kinder Morgan references "the previous contractual relationship" under the Lease) (emphasis added).

29

Nonetheless, Kinder Morgan's actions are entirely consistent with a holdover tenancy. Importantly, a holdover tenancy under Maryland law is <u>not</u> based on objective assent or intent to be bound by a lease. Rather, it exists automatically when a lessee overstays the term of a leasehold. See Md. Code Ann., Real Prop. § 8-402(c) (West 2015) ("Unless stated otherwise in the written lease . . . when a landlord consents to a holdover tenant remaining on the premises, the holdover tenant becomes . . . a periodic month-to-month tenant . . . ."). When a tenant holds over, the tenancy remains "on all the terms and conditions of the original lease." Straley v. Osborne, 278 A.2d 64, 68 (Md. 1971).

Despite demonstrating an intent not to be bound by the terms of the Lease in its negotiations with RG Steel's predecessors, Kinder Morgan undoubtedly remained at Sparrows Point after the final Interim Agreement expired. As the district court observed, it also continued to pay rent, utilities, and wharfage fees to the owners of the property, and it continued to operate and maintain the Bridge Crane. Kinder Morgan also failed to take any of the actions that would have been required upon the expiration of the Lease, including surrendering the property and conducting a final inspection of the Bridge Crane. Based on Kinder Morgan's behavior, I agree with the district court's conclusion that the purchase orders

30

alone could not possibly be construed to govern the parties' relationship. And although Kinder Morgan did not consider itself bound by any agreement with RG Steel's predecessors, its continued presence at the site and "good faith" adherence to the terms of the Lease is consistent with a holdover tenancy.

Due to the holdover tenancy, the Lease terms remained in force beginning on January 1, 2006, to the extent the parties did not replace those terms with express, written agreements. Among the Lease terms was an entire section dedicated to the Bridge Crane wherein Kinder Morgan and its predecessors agreed to assume "the entire risk of loss, theft, or destruction of the No. 4 Bridge Crane resulting from any cause whatsoever." J.A. 690. The Lease's indemnity provision further clarified Kinder Morgan's liability, stating that it would "indemnify and save harmless" the crane's owner from any loss or liability resulting from any damages sustained by the owner as a result of any act or omission of Kinder Morgan, "whether negligent or otherwise." J.A. 692. Undoubtedly, the terms of the Lease directly covered the subject matter of Kinder Morgan's liability in the event of damage to the Bridge Crane, and did not provide for any limitation on consequential damages.

In February 2008, the parties entered into a purchase order under which Kinder Morgan agreed to unload "up to 500,000 nton of coke from ships with Bridge Crane." J.A. 992. Delivery of

31

the coke was promised approximately four months later, and the purchase order provided for a delivery location, a unit price, and a total price. The purchase order also made reference to the buyer's terms and conditions, contained in a document called the AMUSA-100 "General Purchasing Conditions for Purchase of Goods or Services." The first sentence of the AMUSA-100 clearly states its scope: "These General Purchasing Conditions ("GPC") <u>shall apply to the purchase</u> of any materials, items, products . . . and any related services ("Goods") offered or provided by suppliers ('Seller')." J.A. 997 (emphasis added). The terms of the AMUSA-100 thus explicitly apply to the procurement of specific goods and services, addressing such topics as price adjustments, delivery, inspection of the product, and warranties on the goods exchanged.

Although the "Warranty – Liability" portion of the terms states that neither party will be liable for consequential damages "under this order," that language is preceded by five sections referring to the nature of the goods delivered under the purchase order, including their quality, performance, and timely delivery. The limitation on liability under the purchase order is narrow in scope: it only covers liability resulting directly from Kinder Morgan's delivery of goods and services to RG Steel and its predecessors. The purchase order and its accompanying terms do not address Kinder Morgan's liability in

32

the event that it fails to maintain and protect the Bridge Crane itself, despite the fact that Kinder Morgan was unloading coke at the time of the accident. I would therefore find that because the terms of the Lease were the only manifestation of the parties' intent with respect to the damages caused by the accident, those terms apply and there is no limitation on Kinder Morgan's liability.[*]

Ultimately, I agree with the majority's view that the terms of the Lease remained in force and continued to govern the parties' relationship at the time of the accident. Although the parties subsequently entered into written purchase orders, those orders (and their accompanying terms and conditions) addressed a subject matter distinct from the events of this case and thus do not supersede the Lease terms. I therefore join in the majority's conclusion that Kinder Morgan is liable for consequential damages, and that the district court did not err in relying on Appellee's expert in calculating those damages.

---

[*] The majority applies the Lease terms indirectly through the AMUSA-100's "safety valve provision." But because I do not agree that the limitation on liability in the purchase order and the indemnity clause in the Lease are "corresponding . . . provisions" "in contradiction with" each other, J.A. 997, I conclude that Kinder Morgan's liability for the accident is governed only by the Lease.